# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| Petitioner, | § |
| | § |
| ChanThol Chem - A#025374511 | § |
| | § |
| v. | § |
| | § |
| Respondents, | § |
| | § |
| Jefferson Sessions III, U.S. Attorney General | § |
| Kirstjen Nielsen, U.S. Secretary of the | § Civil Action No._____ |
| Department of Homeland Security | § |
| Mark Siegl, U.S. ICE Field Office | § |
| Director for the Houston Office | § |
| Tony Bryson, U.S. ICE District Director | § |
| for the Houston Office | § |
| Andrew Bless, U.S. ICE Deportation | § |
| Officer for the Houston Office | § |
| and, Robert Lacy Jr., Warden of CoreCivic | § |
| Houston Processing Center. | § |
| | § |
| | § |

United States Courts
Southern District of Texas
FILED

SEP 13 2018

David J. Bradley, Clerk of Court

## PETITION FOR A WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2241

Petitioner, ChanThol Chem (A#025374511), appearing Pro Se, hereby petitions this Court for a writ of habeas corpus to remedy Petitioner's unlawful detention by Respondents. In support of this petition and complaint for the injunctive relief, Petitioner alleges as follows:

## PRO SE STANDARDS

Petitioner is in consideration of *Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972), holding that Pro Se litigants are to be held less stringent standards in drafting their motions pleadings than trained lawyers during the determination of this response.

## PRELIMINARY STATEMENT

1.      As of date of the Petition, Petitioner has been detained by Immigration and Customs Enforcement ("ICE") for over 90 days, with no end to the Petitioner's detention in the reasonable foreseeable future. Petitioner was detained and place in removal proceedings by ICE on **May 23, 2018.** ICE continues to take unlawful actions to arbitrarily detain the Petitioner. Petitioner was initially ordered by an Immigration Judge ("IJ") with <u>Final Order of Removal on October 10, 1997</u> at 970 Pickett Street North, Bayport, MN 55003. Board of Immigration Appeals ("BIA") dismissed the APPEAL for no filing on June 26, 1998.

2.      Petitioner's prolonged, indefinite detention pending removal proceedings violates the U.S. Constitution's Fifth Amendment because it deprives Petitioner of liberty without due process of law and the Immigration and Nationality Act because it is not authorized by the statue.

3.      This case challenges the government's authority to indefinitely detain a non-citizen without any finding of dangerous or flight risk. It asks that this Court grant the Petitioner release from prolonged immigration detention. Petitioner therefore respectfully requests that this Court issue a writ of habeas corpus and order Petitioner's release from custody, with appropriate conditions of supervision if necessary.

## PARTIES

4.      Petitioner, **CHANTHOL CHEM**, was taken into ICE custody on **May 23, 2018**, and has remained in ICE custody continuously at CoreCivic - Houston Processing Center ("CCHPC") detention facility. Petitioner was initially ordered by an IJ for final order of removal on **October 10, 1997**.

5.      Respondent, **JEFFERSON B. SESSIONS III**, is the Attorney General of the United States and is responsible for the administration of ICE and the implementation and enforcement of the Immigration & Naturalization Act (INA). As such, Mr. Sessions has the ultimate custodial authority over Petitioner.

6.      Respondent, **KIRSTJEN NIELSEN**, is the Secretary of the Department of Homeland Security ("DHS"). She is responsible for the administration of ICE and the implementation and enforcement of the Immigration & Naturalization Act (INA). As such Ms. Nielsen is the legal custodian of Petitioner.

7.      Respondent, **MARK SIEGL**, is the Field Office Director of the Houston Field Office of ICE at 810

Gears Road, Suite 100, Houston, TX 77067 and is Petitioner's immediate custodian. See *Vasquez v. Reno*, 233 F.3d 688, 690 (1ˢᵗ Cir. 2000), cert. Denied, 122 S. Ct. 43 (2001).

8.      Respondent, **TONY BRYSON**, is the District Director of the Houston Field Office of ICE at 810 Gears Road, Suite 100, Houston, TX 77067 and in his capacity is Petitioner's immediate custodian.

9.      Respondent, **ANDREW BLESS**, is the Deportation Officer of the Houston Field Office of ICE at 126 Northpoint Drive, Ste 2020, Houston, TX 77060 and in his capacity is Petitioner's immediate custodian.

10.     Respondent, **ROBERT LACY JR.,** Warden at CCHPC detention facility at 15850 Export Plaza Drive, Houston, Texas 77032 where Petitioner is currently detained under the authority of ICE, alternatively may be considered to be Petitioner's immediate custodian.

## **CUSTODY**

11.     Petitioner is in the physical custody of Respondents and U.S. Immigration and Customs Enforcement. Petitioner is detained at CCHPC detention facility at 15850 Export Plaza Drive, Houston, Texas 77032. ICE has contracted with CCHPC to house immigration detainees such as Petitioner. Petitioner is under the direct control of Respondents and their Agents. Petitioner was taken into the ICE's physical custody on **May 23, 2018** and has remained "in custody" since then.

## **JURISDICTION**

12.     This action arises under the Constitution of the United States, and the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104 - 208, 110 Stat. 1570, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

13.     This Court has jurisdiction under 28 U.S.C. § 2241; art. I § 9, cl. 2 of the United States Constitution ("Suspension Clause"); and 28 U.S.C. § 1331, as Petitioner is presently in ICE custody at CCHPC detention facility at 15850 Export Plaza Drive, Houston, Texas 77032 under color of authority of the United States, and such custody is in violation of the Constitution, laws, or treaties of the United States. This Court

may grant relief pursuant to 28 U.S.C. § 2241, 5 U.S.C. § 702, and the All Writs Act, 28 U.S.C. § 1651. Federal District Courts have jurisdiction to hear habeas corpus claims by non-citizens challenging the lawfulness or constitutionality of their detention by ICE. _Demore v. Kim_, 538 U.S. 510, 516-17 (2003).

## VENUE

14.     Pursuant to _Braden v. 30th Judicial Circuit Court of Kentucky_, 410 U.S. 484, 493-500 (1973), venue lies in the United States District Court for the Southern District of Texas, the Judicial District in which Petitioner resides.

15.     There is no statutory requirement of exhaustion of administrative remedies where a non-citizen challenges the lawfulness of his detention. See, _Louisaire v. Muller_, 758 F. Supp. 2nd 229, 234 (S.D.N.Y. 2010); _Garcia v. Shanahan_ 615. 2nd 175, 180 (S.D.N.Y. 2009). Any requirement of administrative exhaustion is therefore purely discretionary.

16.     In making that decision, the Court should consider the urgency of the need for immediate review. "Where a person is detained by executive order ...the need for collateral review is most pressing ....in this context the need for habeas corpus is more urgent." _Boumediene v. Bush_, 553 U. S. 723, 798, 128 S. Ct. 2229, 171 L. Ed. 2d 41 (2008) (Waiving administrative exhaustion for executives detainees).

## FACTUAL ALLEGATIONS

17.     Petitioner, is a native and citizen of Cambodia, born on **September 02, 1975**. Petitioner has been detained in DHS/ICE custody since **May 23, 2018**. Petitioner has been detained two times prior, on or about July 1997 and on or about August 2007, since his Final Order of Removal on October 10, 1997. In both instances, 1997 and 2007, Petitioner was **released** unto Order of Supervision because Cambodia would not accept his repatriation. When DHS/ICE released Petitioner both times, ICE determined that Petitioner presented no danger or flight risk such that his release was warranted. As of date, Petitioner has been detained thus far a total of over 180 approximate days following his final order of removal.

18.     Petitioner, came to the United States of America ("U.S.A.") after escaping his native country of Cambodia in 1979 during the reign of the Khmer Rouge's campaign of mass murder and torture (1974 – 1980). Petitioners' father, Chem Thlang, had fought as a soldier under then Cambodian's president Lon Nol

military alongside the U.S.A. during the civil war against the Khmer Rouge. <u>Petitioners' parents, father, Chem, mother, Samon Kroch, lost the lives of all their family members during the fall of Cambodia, including their two eldest daughters – barely escaping with their three young children (three sons and a daughter).</u> Petitioners' parents sent out letters requesting assistant from the U.S.A. and was accepted as refugees particularly for his father's military involvements.

19.     Petitioner entered the U.S.A. at Tempe, Arizona via San Francisco, California on **January 27, 1983 as a refugee** under his parents guardianship. Petitioner shortly upon entranced into the U.S.A. adjusted his refugee status to that of Lawful Permanent Resident ("LPR"). <u>Petitioner is an LPR and has been since entering the U.S.A.</u> Petitioner initially lived in Tempe, AZ for about a year before his family moved to St. Paul, MN. Petitioner grew up in the surrounding suburbs of St. Paul, Minnesota where he attended grade school through high school. Petitioner moved to Dallas, Texas when he was 25 yrs old with an opportunity to purse a career as an accountant. Petitioners' primary language is English - fluent in reading, writing and speaking and is not fluent in any aspects of the Cambodian language. Petitioner is really technically and legally without a country except the United States because his parents entered the U.S.A. as refugees.

20.     Petitioners' parents and three siblings - Alex Chem, Christian Chem, and Chanotdom Chem-Smith are all U.S.A. citizens. Petitioners' immediate family all live in the surrounding suburbs of Minneapolis/St. Paul of Minnesota with their respective families. Petitioners' parents, Chem and Samon, are getting older and their health have been declining. His father, Chem, has been dealing with severe kidney pains, digestive issues, and arm/back nerve damages from the injuries relating from his previous work history (retired). His mother, Samon, has been going through treatment with prolonged headaches, diabetes (type 1) and in remission from breast cancer. His parents have been and continue to be lawfully productive U.S.A. citizens. Petitioners' sister, Chanotdom, has been helping with their parents medical issues and financial cost related to these issues. Petitioners' parents currently reside with his sister, Chanotdom and her husband Calvin Smith. Petitioners' sister not only has to take care of their parents but her own family as well (4 children) – she needs Petitioners' help with their parents. Petitioners' parents have already dealt with the pains and heartaches of losing their entire family during the Khmer Rouge genocide in Cambodia, particularly their two eldest daughters - <u>they can not afford the lost of another child here in the U.S.A.</u>

21.     Petitioner has three daughters all under the age of 21 years old, born in the U.S.A. (Dallas,TX Suburbs): Katlyn Ashley Cox (18 yrs old), Kylee Nicole Chem (16 yrs old) and Kirsten Samone Chem (11 yrs old). His daughters currently reside in McKinney, TX with their mother Brande Dixon (common law

ex-wife). For about the past 8 years since his incarceration and immigration detention; his daughters have grownup without their father's emotional, physical, and financial support. <u>Petitioners' ex-wife has been struggling emotionally, mentally, and financially having to raise their three young daughters on her own, trying to be both mom and dad at the same time - this has taken a dramatic toll on her overall well being.</u>

22.    Petitioner has never known or lived in any other country but the U.S.A. for over the past **35 years** except Cambodia where he was born. <u>Petitioner has deep roots here within the U.S.A., with extensive family and professional work history.</u> **Petitioner has no ties of any kind or any family living in Cambodia.** The liberty of Petitioner is undoubtedly at stake, and this interest cannot be trivialized. See *Bridges v. Wixon*, 326 U.S. 135, 154, 65 S. Ct. 1443, 89 L. Ed. 2103 (1945) (deportation "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom"). Many Petitioners have been living in the United States since they were small children, and have remained in this country for decades after they were ordered removed to Cambodia. They have grown up in our communities, obtained gainful and productive employment, and raised families of their own. For these Petitioners, being deported to Cambodia means starting their lives over in a foreign country and apart from their loved ones. <u>Petitioner clearly have a strong liberty interest in remaining in this country.</u> See *Am.-Arab Anti-Discrimination Comm. v. Reno,* 70 F.3d 1045, 1068-69 (9th Cir. 1995) ("Aliens who have resided for more than a decade in this country . . . have a strong liberty interest in remaining in their homes.").

23.    Petitioner has completely refocused his life and made commitments to change daily. Petitioner has rededicated his life and faith in **Jesus Christ as his Lord and Savior**. Petitioner is a good member of the family and is learning to become a better person overall (See Exhibit No. 1 - Support Letters). Petitioner had obeyed and served the sentences as ordered by Court. Petitioner has been cooperative with all authority and will continue to do so as expected of him.

24.    Petitioner has made horrible and regretful mistakes in his life, he has a criminal history consisting of "aggravated felony". At the age of 19, Petitioner, was convicted of felony aggravated robbery in the State of Minnesota on or about in 1994. He was sentenced to 58 months, served approximately 42 months with Minnesota Department of Corrections and successfully finished parole. At the age of 34, Petitioner, was convicted of felony theft in the state of Texas in 2011. He was sentenced to 10 years, served 7 ½ years with Texas Department of Criminal Justice ("TDCJ") and released unto Mandatory Supervision parole with an expiration date of **November 3, 2020.**

25.     On **May 15, 2018** the TDCJ Pardons and Parole Division issued a Certificate of Mandatory Supervision for Petitioners' parole, with conditions (See Exhibit No. 2 - State of Texas Parole Certificate). ICE took Petitioner into custody from the Huntsville Unit (formerly Walls Unit) in Huntsville, TX after being paroled. When taken into custody Petitioner had his photo taken, finger printed and signed paperwork by DHS/ICE officers.

26.     Petitioner has tried to claim Derivative Citizenship through his parent by submitting a formal letter of request to Immigration courts in Texas and Minnesota. Petitioners' father became a U.S.A citizen in 1993 while Petitioner was still a minor (See Exhibit No. 3 - Derivative Citizenship). Unfortunately under Immigration and Nationality Law 320 (clause time frame between years 1952 – 2001) states that both parent had to be naturalized while Petitioner was a minor, his mother didn't naturalized until 2006 when he was 30 years old. Though current INA 320 (Child Act 2001) he would be consider a citizen. Petitioner submitted an ICE Immigration Special Correspondence form to deportation officer Andrew Bless regarding this matter and Mr. Bless did reply back stating Petitioner did not qualified under current INA 320 law.

27.     Petitioner addressed a letter to deportation officer Andrew Bless, on **July 25, 2018** requesting for information pertaining to his case (See Exhibit No. 4 - Andrew Bless Letter). Petitioner met with his assigned deportation officer, Andrew Bless, on **August 7, 2018** regarding his case at the CCHPC detention facility. Officer Andrew Bless <u>would not answer and/or could not help</u> him with the questions and concerns listed on the letter. In particular, "Dates in 1997, 2007 and 2018 when ICE had sent in repatriation request to Cambodian Central Authority government for my travel documents? What, if any, was the answer the Cambodian government replied back with on travel documents?" (See Exhibit No. 5 - Sworn Declaration of ChanThol Chem).

28.     Petitioner was informed verbally by officer Andrew Bless that most likely his 90 Day review would be denied and DHS/ICE will hold Petitioner for another 90 days. Officer Andrew Bless informed Petitioner, the main reason for the denial was because he received an email from DHS/ICE Headquarters Post-Order Detention Unit ("HQPDU") that Petitioner was on a waiting list to be interviewed by the Cambodian consulate. Petitioner **has not** received a written notice from Royal Cambodian Embassy nor from DHS/ICE about any pending interview. As of date, DHS/ICE **has not** given any written notice to Petitioner concerning the status of his "90 Day" review date of which was on or about **August 22, 2018**, pursuant to Post-Order Review procedures at 8 C.F.R. § 241.4(h)(2) *Notice to Alien*.

29.     "All notices, decisions, or other documents in connection with the custody reviews conducted under this section (**Section 241.4**) by the district director, Director of the Detention and Removal Field Office, or Executive Associate Commissioner shall be served on the alien, in accordance with 8 CFR 103.8, by the Service district office having jurisdiction over the alien. The District Director or Director of the Detention and Removal Field Office will provide written notice to the detainee approximately <u>30 days in advance</u> of the pending records review so that alien may submit information in writing support letters of his or her release". As of date, Petitioner **has not** receive any notice(s) by DHS/ICE, concerning the ninety (90) day removal period or review which is covered in Section 241(a)(1) of the Immigration and Nationality Act, U.S.C. 123(a). As of date, DHS/ICE **has not** responded to Petitioner's request for release, sent on **August 9, 2018** (See Exhibit No. 6 - 90 Day Release Request Letter). And as of date, Petitioner **has not** receive a written "Decision to Continue Detention Upon Expiration of Removal Period" from DHS/ICE, yet, Petitioner continue to languish in detention.

30.     DHS/ICE failure to comply with their own regulation and failure provide legally-required procedures violate Petitioner's right to Due Process. See _D'Alessandro v. Mukasey_, 628 F.Supp.2d 368 (W.D.N.Y. 2009). As Petitioner points out, this is the "critical six-month review" (90 day removal period plus three months), "include specifically due to the constitutional requirements of _Zadvydas_," which held that <u>detention is presumptively reasonable only for a period of **six months following a Final Order of Removal**</u>. See _Ly v. Hansen_, 351 F.3d at 276 ("The Supreme Court [in _Zadvydas_] set a presumptive standard of 90 days and an outside limit of six months detention for aliens who have been ordered absent a showing of a strong 'special justification' for detention.")(citing _Zadvydas_, 533 U.S. at 690, 701).

31.     Petitioner **in good faith** has been cooperative and provided ICE deportation officers in the past and present with his photographs, fingerprints, identifications, signed for travel document applications and/or other related paperwork's.  To the best of his knowledge, Petitioner, provided past and current information about when and where he was born, and how he and his family entered the United States. Cambodia and the United States of America signed a Repatriation Agreement on **March 22, 2002**. DHS/ICE recognizes that Cambodia rarely permits repatriation and does so only after conducting interviews and ascertaining the propriety of repatriation on a case-by-case basis. Petitioner has shown that as of this date the Cambodian government **has not** responded to ICE's request for travel documents. See _Lun v. Ashcroft_, U.S. Dist C02-937L (2002) in which Petitioner, recognizes that a repatriation agreement now exists between the U. S. and Cambodia, but argues that there is no indication that the government is likely to issue travel documents for him in the reasonably foreseeable future. Petitioner further argues that the number of aliens awaiting

repatriation to Cambodia clearly establish that it will take the INS years to deport them all. According to the repatriation agreement, the Cambodian Central Authority is generally supposed to respond to a repatriation request in writing within **30 days** of the request.

32.     Petitioner notes that according to ICE spokesman Brendan Ready, as of December 31, 2017, the total number of Cambodian nationals with final orders of removal and awaiting removal was **over 1,900** in which **1,441** are criminal convictions (See Exhibit No. 7 - NBC News Online Report). See *Chhoeun v. Marin* SACV 17-01898-CJC (GJSx)(2018). However, in the 15 years since the Repatriation Agreement was signed in 2002, **only 575** nationals have been removed as of December 31, 2017, data provided by Khmer Vulnerability Aid Organization (KVAO). Cambodia has accepted only a limit number of persons for repatriate each year, **an average of 47 per year,** and still regularly refuses to issue travel documents (See Exhibit No. 8 - Channel News Asia). Thus, Petitioner argues that there is no indication that the Cambodian government is likely to issue travel documents for him in the reasonably foreseeable future. According to ICE, these Cambodians are still residing within the United States, either in detention or on Supervision, while waiting for their immigration case to be resolved.

33.     Petitioner submitted letters to Royal Embassy of Cambodia regarding his immigration case. Royal Embassy of Cambodia first replied on **July 23, 2018** stating that "With regard to deportation procedure, base on MOU between U.S. government and Cambodia, the U.S. side has to send request to Cambodia Government. After receive a request for travel document. Cambodia side will arrange with U.S. to send officers from Cambodia to conduct a verification interview. Then Cambodian officers will decide how many travel documents will issued for deportee. This process is take more time." (See Exhibit No. 9 - Royal Embassy of Cambodia Letters). Petitioner further argues that as of date, that Petitioner **has not** been interviewed by the Cambodian consulate nor has there been a respond from Cambodia for any possibilities for travel documents. There has been no individualized consideration of Petitioner's case by the Cambodian government and Respondents have indicated no reasonable time period in which removal is likely to occur.

34.     Petitioner **has not** been provided with any reliable grounds to believe that Cambodia will agree that repatriation would be humane, appropriate, or warranted in his case. On information and belief, ICE has no particularized evidence that Petitioner can be repatriated to Cambodia. The Leitner Center for International Law & Justice at Fordham Law School did a study on repatriation in response to public outcry regarding the harm caused to individuals, families, and communities when a child refugee is repatriated to a country they do not know and is not their home. Like Petitioner, those deported had never lived in Cambodia or left

as a young children, had U.S. citizen family members who depended upon them for affection, care and support, lacked any personal or business ties in Cambodia, and had made the U.S. their home for decades (See Exhibit No. 10 - Leitner Study). Petitioner fears the detrimental of emotional, psychological, and financial affects to his U.S. citizen parents, daughters, and other dependents of his removal.

35.     More likely than not, if Petitioner is deported back to Cambodia due to his religion and devout belief in **Christianity**, he will surely face irrefutable harm, be victimized and/or persecuted. Southeast Asian countries including Cambodia, Thailand and Laos are Theravada Buddhist countries. Article 20 of the 1976 Constitution of Democratic Kampuchea guarantee religious freedom, but it also declared that "all reactionary religions that are detrimental to Democratic Kampuchea and the Kampuchean People are strictly forbidden." About 95 percent of the population follows the Theravada school of Buddhism. After the fall of Phnom Penn people who expressed religious sentiments or were caught praying were executed. Petitioner would not have liberty to practice his beliefs without irrefutable harm. See 2016 Cambodian Human Rights Country Report: In April 2015 the government deployed more than 1,000 soldiers to the Vietnamese border at Ratanakiri-Dak Lak to prevent more than **100 Christian** Montagnard asylum seekers **from entering** the country. See the Department of State's International Religious Freedom Report at www.state.gov/religiousfreedomreport.

36.     The Cambodian government, which is currently ruled by Prime Minister Hun Sen and the Cambodia Peoples Party with its military have been responsible for the extensive human right abuse such as torture, arbitrary arrest, killings and disappearances which violates agreements with the United Nations High Commissioner for Refugees ("UNHCR")(See Exhibit No. 11 - Human Rights Violation). Cambodia is currently going through a political battle with authorities who said to be supporters of the communist party. Cambodia has been known **to not** comply with Article 17 of the Optional Protocol to the Convention Against Torture and other Cruel, Inhuman and Degrading Treatment or Punishment (OPCAT). Petitioners' father, Chem, served as an allied soldier with the U.S.A military during the civil war against Khmer Rouge regime. Petitioners' father lost the lives of his brothers and other family members **because** they fought in the Cambodian army against the Khmer Rouge. Petitioners' father seeing no hope left with the fall of Cambodia and already the lost of family lives decided to leave his military post. Petitioners' father fearing for the lives of the rest of his remaining family took flight north to Thailand. Petitioners' parents have never gone back to Cambodia, even to visit -- fear of potential persecution alongside the many memories of pains and heartaches. As such, Petitioner, has very reasonable fears that it is **more likely than not** that he will be persecuted in one extreme manner or another if repatriated to Cambodia because of his father and family's

past involvement against the communist party. See *Seng v. Holder*, 584 F.3d 13, 18, 20 (1st Cir. 2009). This is grounds for "Withholding of Removal and the Convention Against Torture" which may **grant Petitioner relief**. The Attorney General has discretion to grant asylum to a refugee who is unable or unwilling to return to his or her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. To be eligible for asylum, an alien must establish his or her status as a refugee." **8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)**. Persecution "is an 'extreme concept' that involves the infliction or threat of death, torture, or injury to one's person or freedom, on account of a protected characteristic." *Malonga v. Holder*, 621 F.3d 757, 764 (8th Cir. 2010), quoting *Sholla v. Gonzales*, 492 F.3d 946, 951 (8th Cir. 2007). "Moreover, the persecution must be inflicted by the government or by persons that 'the government is unwilling or unable to control.'" *Cubillos v. Holder*, 565 F.3d 1054, 1057 (8th Cir. 2009), quoting *Flores-Calderon v. Gonzales*, 472 F.3d 1040, 1043 (8th Cir. 2007).

37.     Petitioner does not appear to be a danger to the community, and DHS/ICE has made no assertion to the contrary. In addition, Petitioner **has not** received an individualized hearing before a neutral decision maker to assess whether detention is warranted due to danger or flight risk. Petitioner has demonstrated in the past while he was under DHS/ICE Order of Supervision that he followed the rules and guidelines (See Exhibit No. 12 - Order of Supervision). To date, however, ICE has been unable to remove Petitioner to Cambodia, and is not significantly likely to occur in the reasonably foreseeable future, or at all. Petitioner has been detained over 180 days total in ICE custody following his Final Order of Removal back on October 10, 1997. Petitioner has proven that there is no significant likelihood of his removal in the reasonably foreseeable future. Based on facts above and as of date the six-month period established by the Supreme Court in *Zadvydas* expired, and Petitioner should be released immediately.

## LEGAL FRAMEWORK FOR RELIEF SOUGHT

38.     Petitioner re-alleges and incorporates by reference paragraph 1 through paragraphs 37.

39.     In *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Supreme Court held that six (6) months is presumptively reasonable period during which ICE may detain aliens in order to effectuate their removal. *Id.* At 702. See *Demore v. Kim*, 538 U.S. 510, 543, (2003). In *Clark v. Martinez*, 543 U.S. 371 (2005), the Supreme Court held that its ruling *Zadvydas* applies equally to inadmissible aliens. Department of Homeland Security administrative regulations also recognize that the HQPDU has a six-month period for

determining whether there is significant likelihood of an alien's removal in the reasonably foreseeable future. 8 C.F.R. § 241.13(b)(2)(ii). In *Lun v. Ashcroft*, U.S. Dist C02-937L (2002) in which Petitioner, recognizes that a repatriation agreement now exists between the U. S. and Cambodia, but argues that there is no indication that the government is likely to issue travel documents for him in the reasonably foreseeable future. Petitioner further argues that the number of aliens awaiting repatriation to Cambodia clearly establish that it will take the INS years to deport them all.

## CLAIMS FOR RELIEF

### COUNT ONE

### STATUTORY VIOLATIONS

40.  Petitioner re-alleges and incorporates by reference paragraph 1 through paragraphs 39.

41.  Petitioners' continued detention by Respondents is unlawful and contravenes 8 U.S.C. § 1231(a)(6) as interpreted by the Supreme Court in *Zadvydas*. The six-month presumptively reasonable period for removal efforts has expired. Petitioner still **has not** been removed, and Petitioner continues to languish in detention. Petitioner's removal to Cambodia or any other country is not significantly likely to occur in the reasonable foreseeable future. The Supreme court held in *Zadvydas, Demore, Martinez,* and *Lun* that ICE's continued detention of someone like Petitioner under such circumstances is unlawful.

### COUNT TWO

### SUBSTANTIVE DUE PROCESS VIOLATION

42.  Petitioner re-alleges and incorporates by reference paragraph 1 through paragraphs 41.

43.  Petitioner's continued detention violates Petitioner's right to substantive due process through a deprivation of the core liberty interest in freedom from bodily restraint. Petitioner's prolonged detention under § 1225(b) without any individualized assessment of the need for detention deprives Petitioner of due process of law. The Court should therefore order of release from unconstitutional detention.

44.     The Due Process Clause of the Fifth Amendment forbids the government from depriving any "person" of liberty "without due process of law". U.S. Constitution. Amend. V. "[T]he Due process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent. *Zadvydas v. Davis*, 533 U.S. 678 (2001). For this reason, even "removable and inadmissible aliens are entitled to be free from detention that is arbitrary and capricious," Id. at 721 (Kennedy, J. dissenting). That constitutional protection is unaffected by the government's authority to make rules for "admission" that regulate the immigration status of non-citizens. *See* 8 U.S.C § 1101(a)(13)(A) (defining admission as "the lawful entry of the alien").

45.     "A statue permitting indefinite detention of an alien would raise a serious constitutional problem" under the Fifth Amendment's Due Process Clause. Id. at 690. That serious constitutional problem is raised by the government's reading of § 1225(b). It interprets the statue to permit the indefinite detention of a non-citizen whom the government has not found to be removable or admissible, but instead granted the right to remain in the United States pending removal proceedings after demonstrating a credible fear of persecution to an asylum officer. In *Zadvydas v. Davis,* the Supreme Court rejected the government's argument that its immigration powers permit it to indefinitely detain non-citizens after conclusion of removal proceedings. Id. at 695. Since then, the government has repeated that same argument to justify prolonged, indefinite detention pending removal proceedings.

46.     Each time, Federal Courts have roundly rejected it. Every Court of Appeals to consider prolonged detention under INA § 236(c), 8 U.S.C § 1226(c) – a statue that, like § 1225(b) mandates detention of inadmissible non-citizens pending removal proceedings – holds it limited to reasonable period by the Due Process Clause. Reading *Demore* and *Zadvydas* together, and as a matter of constitutional avoidance, five other circuits have rejected the government's position and construed § 1226(c) to contain an implicit temporal limitation and to authorize criminal aliens' detention, not indefinitely, but for a reasonable amount of time after which a bond hearing is necessary to fulfill the purposes of the mandatory detention statute. See *Reid v. Donelan*, 819 F.3d 486, 494 (1st Cir. 2016) (stressing the concept that "a categorical, mandatory, and indeterminate detention raises severe constitutional concerns" in recognizing "that the Due Process Clause imposes some form of 'reasonableness' limitation upon the duration of detention that can be considered justifiable under that statute," and finding "it necessary to read an implicit reasonableness requirement into the statute"); *Lora v. Shanahan*, 804 F.3d 601, 606 (2d Cir. 2015) ("[W]e hold that, in order to avoid significant constitutional concerns surrounding the application of section 1226(c), it must be read to contain an implicit temporal limitation."), petition for cert. filed, 84 U.S.L.W. 3562 (U.S. Apr. 21,

2016) (No. 15-1307); _Rodriguez v. Robbins_, 715 F.3d 1127, 1138 (9th Cir. 2013) ("[W]e conclude that, to avoid constitutional concerns, § 1226(c)'s mandatory language must be construed to contain an implicit reasonable time limitation . . . ." (quotation marks omitted)); _Diop v. ICE/Homeland Sec._, {825 F.3d 1213} 656 F.3d 221, 231-32 (3d Cir. 2011) ("[W]e conclude that the statute implicitly authorizes detention for a reasonable amount of time, after which the authorities must make an individualized inquiry into whether detention is still necessary to fulfill the statute's purposes of ensuring that an alien attends removal proceedings and that his release will not pose a danger to the community."); _Ly v. Hansen_, 351 F.3d 263, 267-68, 270-71 (6th Cir. 2003) ("Therefore, we hold that the INS may detain prima facie removable aliens for a time reasonably required to complete removal proceedings in a timely manner. If the process takes an unreasonably long time, the detainee may seek relief in habeas proceedings.").

47.     In doing so, they follow _Demore v. Kim_, 538 U.S. 510, 543, (2003). _Demore_ identified mandatory detention pending removal proceedings as a "brief period" lasting "roughly a month and a half in the fast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal."

48.     Petitioner's prolonged, indefinite detention under § 1225(b) violates the Fifth Amendment by depriving him liberty without due process of law. This Court should therefore order his release, with appropriate conditions of supervision if necessary. See, e.g., _Nadarajah v. Gonzales_, 443 F.3d 1069, 1084 (9th Cir. 2006); _Madrane v. Hogan_, 520 F. Supp. 2d 654 (M.D. Pa. 2007); _Victor v. Mukasey_, 2008 WL 5061810 (M.D. Pa. Nov. 25, 2008); _Nunez-Pimentel v. U.S. Dept of Homeland Security_, 2008 WL 2593806 (M.D. Pa. June 27, 2008) (ordering release from prolonged detention pending removal proceedings).

49.     It is "well established that aliens facing deportation from this country are entitled to due process rights under the Fifth Amendment." See _Walters_, 145 F. 3d at 1037. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." See _Mathews v. Eldridge_, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Id. at 333 (citations and quotations omitted). "Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Due process is flexible and calls for such procedural protections as the particular situation demands." Id. at 334 (citations and quotations omitted). To determine the procedural protections, the Court balances three factors: "(1) the private interest affected; (2) the risk of

erroneous deprivation through the procedures used, and the value of additional safeguards; and (3) the government's interest, including the burdens of additional procedural requirements." See *Shinault v. Hawks*, 782 F.3d 1053, 1057 (9th Cir. 2015) (citing *Mathews*, 424 U.S. at 335).

50.     In *Lun v. Ashcroft*, U.S. Dist C02-937L (2002) in which Petitioner, recognizes that a repatriation agreement now exists between the U. S. and Cambodia, but argues that there is no indication that the government is likely to issue travel documents for him in the reasonably foreseeable future. Petitioner further argues that the number of aliens awaiting repatriation to Cambodia clearly establish that it will take the INS years to deport them all. The Court agrees with Petitioner. Petitioner has shown that as of this date the Cambodian government has not responded to the government's request for travel documents According to the repatriation agreement, the Cambodian Central Authority is generally supposed to respond to a repatriation request in writing within 30 days of the request.  More than 180 days has passed since the INS requested travel documents on April 10, 2002. In addition, respondents have not indicated that any other efforts have been made to obtain travel documents since their initial effort. The government's bold statement that petitioner is likely to be removed in the reasonably foreseeable future because there is now a repatriation agreement fails to provide sufficient evidence to rebut petitioner's allegations that removal is not likely in the reasonably foreseeable future. To comply with the Supreme Court's instruction in *Zadvydas*, the government must provide a more particularized showing.

51.     The Due Process Clause of the Fifth Amendment requires that the deprivation of Petitioner's liberty be narrowly tailored to serve a compelling government interest. While Respondents would have an interest in detaining Petitioner in order to effectuate removal, that interest does not justify the indefinite detention of Petitioner, who is not significantly likely to be removed in the reasonably foreseeable future. *Zadvydas* recognized that ICE may continue to detain aliens only for a period reasonably necessary to secure the alien's removal. The presumptively reasonable period during which ICE may detain an alien is only six (6) months. Petitioner has already been detained in excess of six (6) months and Petitioner's removal is not significantly likely to occur in the reasonably foreseeable future.

## COUNT THREE

## VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT § 235(b), 8 U.S.C. § 1225(b)

52.     Petitioner re-alleges and incorporates by reference paragraph 1 through paragraphs 51.

53.    Through the government's interpretation of § 1225(b) as permitting indefinite mandatory detention is unconstitutional. "[w]hen the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is cardinal principle that this Court will first ascertain whether a construction of the statue is fairly possible by which the question may be avoided." *Crowell v. Benson*, 285 U.S. 22, 62 (1932); see also *Zadvydas,* 533 U.S. 678 at 689 (citing *Crowell*). This doctrine of statutory interpretation as known as constitutional avoidance.

54.    "[T]he Supreme Court has instructed that, where one possible application of a statue raises constitutional concerns, the statues as a whole should be construed through the prism of constitutional avoidance." See *Rodriguez v. Robbins*, 715 F.3d at 1127, 1144 (citing *Clark v. Martinez*, 543 U.S. 371 380 (2005). "thus, the dispositive question is not whether the government's reading of § 1225(b) is permissible in some (or even most) cases, but rather whether there is any single applications of the statue that calls for a limiting construction." Id.

55.    In *Martinez*, The Court analyzed § 1231(a)(6), a statue it had previously read as a matter of constitutional avoidance to limit mandatory detention after the conclusion of removal proceedings to a presumptively reasonable period of six months. *Zadvydas v. Davis*, 533 U.S. at 678. The same statue applied to both admitted and inadmissible non-citizens, but the government argued that the same limit on detention did not apply to inadmissible non-citizens because they were not entitled to the same constitutional protections. *Martinez*, 543 U.S. at 380.

56.    The text of the statue did not distinguish between two classes, however, and "[t]o give these same words a different meaning for each category would be to invent a status rather than interpret one". Id. at 378. Because the same statutory text applied to both groups, and detention for more than six months raised constitutional concerns for at least the admitted non-citizens, every non-citizen subject to the statue was entitled to the same reading limiting mandatory detention. "The lowest common denominator as it were, must govern." Id. 380.

57.    As explained above in the Count Two for Relief, arriving asylum seekers are entitled to be free from arbitrary and capricious detention under the Due Process Clause. Even assuming *arguendo* they were not, however, LPRs are entitled to due process in prolonged detention because "once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly." *Landon v. Plasencia*, 459 U.S. 21, 32, (1982).

58.    In *Plasencia*, the Supreme Court ruled that an LPR seeking readmission after a trip abroad and charged as "excludable" (the former term of art for "inadmissible" under then-current immigration laws), could nonetheless "invoke the Due Clause on returning to this country..." Id. Because an LPR's due process right is constitutional in nature, it may not be stripped by mere statutory designation as an "arriving alien." See *Kwong Hai Chew v. Colding*, 344 U.S. 590, 600 (1953) (in the case of returning LPR, holding that "[f]rom a constitutional point of view, he is entitled to due process without regard to whether or not, for immigration purposes, he is to be treated as an entrant alien").

59.    Moreover, because the text of § 1225(b) does not distinguish between LPRs and other non-citizens charged as arriving aliens, LPRs are the statue's "lowest common denominator." Martinez, 543 U.S. at 380. Section § 1225(b) must therefore be read to grant all non-citizens held as arriving aliens the same due process protections afforded to LPRs in unreasonably prolonged detention. *Rodriguez v. Robbins*, 715 F.3d 1127, 1142-43, at *1; *Saleem v. Shanahan*, 2016 WL 4435246 at **3-5.**

60.    8 U.S.C. § 1231(a) governs the detention of persons like Petitioners and class members who have been ordered removed. The statue directs ICE to detain individuals for 90 days while carrying out a removal order. § 1223(a)(2). The 90 day "removal period" generally begins when a removal order **becomes final. Absent an applicable exception, a person who is not removed within 90 day removal period is supposed to be released subject to supervision.** § 1231 (a)(3).

61.    Section 1231(a)(6) permits detentions beyond 90 days in limited circumstances. But even when § 1231(a)(6) applies, the Supreme Court in *Zadvydas v. Davis* has held that § 1231 (a)(6) does not permit indefinite detentions. 533 U.S. 678, 689 (2001). ICE's detention authority is limited to a period "reasonably necessary" to carry our removal and only when necessary to assure a person's presence for removal. Detention is not permissible when removal is not "reasonably foreseeable."

62.    To provide guidance to lower courts, the Supreme Court in *Zadvydas* recognized six months as a "presumptively reasonably period of detention." The six month period, however, is a presumption, not a rule. A person must be release anytime after the 90 day period if removal is not reasonably foreseeable. 8 C.F.R. § 241.13.26. Even when removal appears reasonably foreseeable, detention must serve a legitimate government interest, namely to prevent danger or flight risk. Due process requires a meaningful, individualized hearing before a neutral decision maker or access danger and flight risk. The government's own regulations permit the release of a person who does not pose a danger or flight risk pending removal -

"without regard to the likelihood of the aliens removal in the reasonably foreseeable future." 8 C.F.R. § 241.13(b)(1). The regulations require ICE to conduct a post-order custody review ("POCR") by end of the 90 day removal period to assess the need for further detention. 8 C.F.R § 241.4(h)(1).

### COUNT FOUR

### VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT § 236(a), 8 U.S.C. § 1226(a)

63.     Petitioner re-alleges and incorporates by reference paragraph 1 through paragraphs 62.

64.     The plain text of § 1225(b) mandates detention of arriving aliens only for the period between their arrest and before they are referred to an immigration judge for removal proceedings. The two subsections of § 1225(b) at issues here permit detention only "*for* further considerations of the application for asylum," 8 U.S.C. § 1225(b)(1)(B)(ii) and "*for* a proceeding ...." Id. § 1225(b)(20(a). Neither provisions governs detention beyond that point, much less pending completion of removal proceedings.

65.     "Where Congress includes particular language in one section of a statue but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or excursion." *Nken v. Holden*, 556 U.S. 418, 430 (2009) (internal citations and alterations omitted). This is "particularly true here" where the provisions at issue were "enacted as part of a unified overhaul" of the statue under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. Id. at 430-31.

66.     The overall construction of the statue also supports a reading that limits § 1225(b) detention to period before removal proceedings commence. *Cf. United States v. Witkovich*, 353 U.S. 194, 199 (1975) ("A restrictive meaning for what appear to be plain words may be indicated be the Act as as whole ..."). Section 1225 is titled "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing." Asylum Interviews: Referral of certain aliens," 8 U.S.C. § 1225(b)(1)(B)(ii), and "Inspection of other aliens: In general," Id. § 1225(b)(2)(A). By their plain language, none of these sections address detention inspection and referral to subsequent removal proceedings. Authority for mandatory detention pending removal proceedings appears instead in 8 U.S.C. § 1226, in as section appropriately titled "Apprehension and detention of aliens." That section does not authorize mandatory detention pending removal for LPRs.

67.     Moreover, as explained above in the Second Claim for Relief, the doctrine of constitutional avoidance requires this Court to "first ascertain whether a construction of the statue is fairly possible by which the [constitutional] question may be avoided." *Crowell v. Benson*, 285 U.S. 22, 62. In light of the text and overall construction of § 1225(b), as discussed above, the statue may be fairly construed to limit mandatory detention to the period before removal proceedings commence. The Court must do so in order to avoid the constitutional question raised by the government's reading.

68.     While the courts of appeals have jurisdiction to review removal orders directly through petitions for review, *see* 8 U.S.C. § 1225(a)(1), (b), the federal district courts have jurisdiction under 28 U.S.C. § 2241 to hear habeas claims by non-citizens challenging the lawfulness or constitutionality of their detention by ICE. *See, e.g., Demore v. Kim*, 538 U.S. at 516-17; *Zadvydas*, 533 U.S. at 687; *Nnadika v. Attorney General of U.S.*, 484 F.3d 626, 632 (3rd Cir. 2007) (holding that, post-REAL ID, challenges to detention remain within the jurisdiction of the district court).

## COUNT FIVE

## UNLAWFUL DETENTION WITHOUT INDIVIDUALIZED DETERMINATIONS OF DANGER AND FLIGHT RISK

69.     Petitioner re-alleges and incorporates by reference paragraph 1 through paragraphs 68.

70.     Detention violates Section 1231 and Due Process under the U.S. Constitution unless it is a reasonably related to the government's purposes of preventing flight and protecting the community. *Zadvydas*, 533 U.S. at 690-91. Petitioner has received no process whatsoever to determine whether his detention is warranted. Petitioner is entitled to individualized determination by impartial adjudicators of whether detention is justified based on danger or flight risk. As of date, Petitioner, **has not** been informed verbally or in writing from DHS/ICE with any review stating if he is a danger to the community or a flight risk. See *Nai Sike Nyan Pha v. Sessions*, 4:18-CV-1630 (2018) deportation officer, Andrew Bless, stated on a Sworn Declaration "*Additionally, my present duties include making initial 90-Day review custody review determinations, in which, following an alien with a final order of removal being in ICE custody for 90 days, I evaluate whether his or her detention should continue based on the flight risk and danger to the community, if released.*"

71.     Under the Due Process Clause of Fifth Amendment, <u>an alien is entitled to a timely and meaningful opportunity</u> to demonstrate that s/he should not be detained. Petitioner in this case has been denied that opportunity. DHS/ICE does not make decisions concerning aliens' custody status in a neutral and impartial manner. The failure of Respondents to provide a neutral decision-maker to review the continued custody of Petitioner violates Petitioner's right to procedural due process. Further, Respondents have failed to acknowledge or act upon the Petitioner's administrative request for release in timely manner. There is no administrative mechanism in place for the Petitioner to demand a decision, ensure that a decision will ever be made, or appeal a custody decision that violates *Zadvydas*, wherefore, Petitioner requires emergency habeas corpus and preliminary injunctive relief.

72.     Petitioner re-alleges and incorporates by reference paragraph 1 through paragraphs 71.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioner prays and respectfully requests that this Court grant the following relief:

1) Assume jurisdiction over this matter;
2) Grant Petitioner a writ of habeas corpus directing the Respondents to immediately release Petitioner from custody on reasonably conditions of supervision if necessary; and or "Withholding of Removal and the Convention Against Torture" which may give Petitioner relief;
3) Declare the Respondents have violated the rights of the Petitioner;
4) Enter preliminary and permanent injunctive relief enjoining Respondents from further unlawful detention of Petitioner;
5) Award Petitioner attorney's fees and costs under the Equal Access to Justice Act ("EAJA"), as amended, 5 U.S.C § 504 and 28 U.S.C § 2412, and on any other basis justified under law; and
6) Grant any other and further relief that this Court deems just and proper.

## VERIFICATION

In the Nature of 28 § U.S.C. 1746(1)

I **declare** under penalty of perjury that I am the Petitioner, I have read this petition, and the information in this petition is true and correct. I understand that a false statement of a material fact may serve as the basis for prosecution for perjury.

Date: _9/7/18_

Respectfully Submitted,

ChanThol Chem (Petitioner) - A#025374511
CoreCivic - Houston Processing Center
15850 Export Plaza Drive
Houston, TX 77032

## CERTIFICATE OF SERVICE

I, ChanThol Chem, here by swear that a true and exact copy of this document has been sent to duty counsel at the below address:

**US District Court for the Southern District of Texas**
**PO Box 61010**
**Houston, TX 77208**

**The Hon. Ryan K. Patrick**
**United States Attorney**
**1000 Louisiana, Suite 2300**
**Houston, TX 77002**

**Mark Siegl**
**Office of the District Counsel**
**810 Gears Road, Suite 100**
**Houston, TX 77067**

ChanThol Chem                    _9/7/18_
A#025374511                        Date

# Exhibit No. 1

# *Support Letters*

Dear officer in charge,

My name is Kylee Chem and I am sixteen years old . I work at a italian restaurant as a waitress to earn money to help out my family but also to teach me responsibility.My relationship to ChanThol Chem is im his daughter and I write this letter to show you my dad is more than just a criminal and more than just a immigrant . As a kid I couldn't have asked for a better childhood, nice house , great neighborhood , happy parents and a crazy sister. Mom stayed home to make sure we had what we needed while dad was out working to help provide the things we needed . I'm gonna make this as short and straight to the point at possible , when my dad got took I was about five to six years old and at first as a young kid you don't understand what is fully happening but as I started getting older I had fell into this deep depression . I wouldn't eat , wouldn't talk to my family and my mom even got me a counselor because I started  acting out and doing bad things in school , at home , to even my sisters which at the time my parents just had my little sister . For awhile I always questioned why my daddy was gone and why he did what he did to get taken knowing he had a family . What killed me the most is having to watch my mother struggle to provide for three kids all on her own and at the time I couldn't do anything to help . Up until about a year or two ago , I didn't have contact with my father at all because my mom was worried about me getting depressed again .Now we talk almost everyday , he checks up on me , I even gossip to him and all I wish for is for him to come home . Not only because America is a better place for anyone but to strengthen our relationship and for him to get the opportunity to know what it's like to raise a teenager , to rebuild his relationship with my sister and to help out as much as he can to repay my mother .

My dad is one of the smartest, most kindest person you could ever meet sometimes he's too smart . He would give the last piece of change he had to help anyone , now he isn't perfect ( obviously lol ) but I can't name someone who is . I know you can't dismiss all the things he's done and how it has slightly affected our country . But please just let him come home to his daughters , his sick parents & his loving family who awaits his arrival everyday . He has a lot of things to makeup for and do and my little sister couldn't write a letter because she didn't fully understand the concept so I write for her . She wants to be able to say she has a dad considering from a young age she really hasn't . This letter took me several weeks to make , just cause I want y'all to really understand how important it is for my dad to come home . Life without both parents has been hard physically and emotionally , but it's not too late please let my daddy come home .

Sincerely his loving daughter , Kylee chem
(469-288-4804)

Chem Thlang
15300 Oak Ridge Cir SE
Prior Lake, MN  55372
(952) 594-1236


January 20, 2018


Dear Officer in Charge:

My name is Chem Thlang.  I am a Cambodian American living in the state of Minnesota.  I have 6 children altogether, 3 boys, and 3 girls.  I am a first generation immigrant from Cambodia.  Due to the terrible war in Cambodia which involve mass killing, we decided to leave the country.  We ended up in the neighboring country of Thailand in 1979.  We lived in Thailand for 2 years before moving to America.

We arrived in the United States of America in 1983.  It was very difficult for me to support my family when I just arrived in our new country.  I ended up working several jobs just to survive.  My life was so hard and busy that I never had the chance to raise my children properly, especially, my youngest son, Chanthol Chem.

Chanthol ended committing several crimes as a young adult.  He spent most of his life in prison paying for his crimes.  At this time, I have heard he might be getting deported to Cambodia.  I don't know a lot of things in my life, but I know for sure that he wouldn't be able to survive in Cambodia.  He was only 5 years old when we got to America, so it is the only country he calls home.  First of all, he doesn't speak Cambodian at all.  In addition, he doesn't know anyone in Cambodia.  All of our relatives got killed during the war.

I am at your mercy in asking you to consider having him stay in America.  As a father, I can't even imagine my son, Chanthol, having to go to Cambodia.  Sending him to Cambodia is sending him to die.

Sincerely,

Chem Thlang

Dear Officer In Charge,

My name is Samon Kroch and I am Chanthol's mother. Chanthol is my 5th born child of 6. I lost 2 daughters during the Khmer Rouge regime back in 1975, the same year Chanthol was born. With the children we had left we came over to the US in 1983 as legal permanent residences.

The country we left behind is filled with nothing but loss and heartache. We endured much hardship to escape anymore loss and took the 4 kids we had left swearing never to return.  We still to this day 35 years later have not returned. I'm asking him to not be deported as we have no family left in Cambodia. Chanthol was only 5 years old when we left the country and has almost no memory of it. He can hardly speak the language anymore. He is an American. He has gone to school here, worked here, has children here and family here. There is nothing for him in Cambodia.  I understand that he broke the law. He has served his time. I feel like a life sentence of being deported is not warranted. It would be a life sentence not only for him but for his daughters (who are only 15 and 11), for me, his father, brothers and sister.

I currently live with my youngest daughter and her family in MN. My daughter works 2 jobs and has 4 kids. I would like to see my sons face before I leave this earth and need his help in caring for me and his father as we are getting old our health is declining. His daughters also need their father. Not only for financial support but for emotional and developmental support as well.

I also ask that if the decision or process of deportation is going to take some time that he be released on supervised released so that he can be present and helpful to us all if and/or before that day comes. He would not try to flee or be of any harm to anyone. His sole purpose and determination would be to serve his family and his kids. He would not take the chance as the risk/price is too high.

My husband was also an ally with the US during the Vietnam War and we are all hard working citizens of the US. I'm asking that he be released to help mend the damage and make up for the lost time.

I thank you for your time and consideration.

*Samon Kroch*

Samon Kroch
15300 Oak Ridge Cir SE
Prior Lake MN  55372
952-200-5938

Dear Officer in Charge,

My name is Chanotdom Chem-Smith and I am Chans youngest sibling. I live in MN with my husband, 4 kids and my parents.

I have known my brother my whole life. When we first came to the US we were very poor. My parents worked multiple jobs and long hours so that we could survive. Chan and I were impacted the most from a social stand point as we were very young. I was 3 and he was 5. While I struggled more emotionally with the cultural difference, Chan became more concerned about not appearing/being poor. My brother is a very loving and kind hearted person. He loves his family and friends very much. Chan would give you the shirt off his back if you needed and would also do volunteer work.

I believe Chan and our family will benefit from his release from ICE so that he can spend time with his children and our family. Especially since there is still a chance he could be in deported in the near future. He is very remorseful and I know in my heart he would never do anything to risk losing everything again. We all miss him very much.

If he is released he would come live with us in MN. We have the means necessary to support him until he gets back on his feet. His older brothers and their families also live very close to us and are there to support him as well if need.

My first memories is from living in the US – this is our home. Neither of us have memories of Cambodia. We don't know the country at all and I cannot fathom him surviving if shipped back. I don't know how his daughters or any of us would get over such a loss.

My parents are getting older and older and would love to be able to see their son again after being in prison for the last 8 years.

Thank you so much for taking the time to read my letter and for your consideration.

Sincerely,

Chanotdom Chem-Smith

15300 Oakridge Cir SE
Prior Lake, MN 55372
952-212-8658

Dear Officer in Charge,


My name is Calvin Smith. I'm writing on behalf of Chanthol "Chan" Chem. In hopes of his release I'd like those concerned to know that Chan has a home to come to. His sister Chanotdom is my wife, and his parents also live with us. I and our family would ask that Chan be released to us.

I believe Chan has been changed by faith and is remorseful for decisions that led to his current fate. It would benefit his daughters, Kylee and Kirsten, beyond measure to have their father back in their lives. If released Chan has the support of his family here to help him reincorporate into a healthy and productive member of society and his family.


Thank you for hearing my request.


Sincerely,

Calvin Smith
15300 Oakridge Cir SE
Prior Lake, MN 55372
952-258-9074

Alec Chantha Chem
13803 Nevada Avenue,
Savage, MN 55378

July 22nd, 2018

Department of Homeland Security
c/o ChanThol Chem – A#025374511
126 Northpoint Drive, Ste 2020
Houston, TX 77060

Dear Officer in Charge,

My name is Alec Chem and I am 50 years old and the first brother to ChanThol Chem. I have
known him my entire life and at this time ChanThol is being detained by immigration and
custom enforcement. I am writing this letter in hopes that Chanthol will not be deported back to
Cambodia. The main reasons that he should not be deported are that he doesn't know the
culture, does not speak the language, and does not have any immediate family in Cambodian.

Before he went to prison he did find himself in trouble which the law but since ChanThol has
been in prison we have been writing back and forth and talking on the phone and I can sense
that he has changed and he has worked really hard to improve himself as a person and regrets
choices he has made in the past.

It is very important that he stays because he has 3 daughters, two brothers and one sister, his
aging parents and many nieces and nephews. I believe he wants to be able to support his
children and be a role model and it would be hard to do so in Cambodia.  I think I can speak for
the rest of my siblings and say that we miss him. We all grew up together and it has been very
hard since he has been gone but he is so important to us and our lives and that is why we have
stayed in touch.

If ChanThol is released and not deported he will be living with our sister Chana, brother-in-law
Cal and our parents. It would mean a lot to our entire family if he got to see his father before we
have to say goodbye. We will be here to support him and help him in any way that we can.

Thank you for taking time to read this letter and for considering this case for review. If there are
any further questions please don't hesitate to contact me either by phone or at my home address
listed on this letter.

Respectfully,

Alec Chantha Chem
(612) 839-6152

Christian Chem
13438 Alabama Ave S
Savage, MN  55378
(952) 457-1020


January 23, 2018

Dear Officer in Charge:

My name is Christian Chem.  I am the 2nd older brother of Chanthol Chem.  My parents, my sibling, and I are currently residing in the state of Minnesota.  Most of my sibling and I are in our 30s and 40s.  We have a very large extended family.  We have been living in Minnesota for a long time, and most likely be here for a foreseeable future.

I'm writing this in hoping I can convince you to show leniency toward to Chanthol in allowing him to stay in America instead of deporting him to Cambodia.  Chanthol was only 5 years old when we got to America, it's the only place where he spent most of his life.  He knows nothing of Cambodia.  He would face unbearable hardship anywhere else, but America.

Like my brother, Chanthol, I'm a father of 2 children.  Unlike Chanthol, I'm very fortunate to have the opportunity to serve my family.  I believe Chanthol would like nothing more than the same chance to support his children, both financially and emotionally.  I know he wants to be the best father to his children.  We, as a family, need him here in America.

If he's allowed to stay here in America, we are more than able to get him started with his new life immediately.  We'll go beyond our limits in supporting him.  Be productive to society would be our main focus.  We have a very good family structure, and would be able to provide him the resources he may need.


Sincerely,

Christian Chem

**Brandon Sisakda**

**14141 Champions Dr., Apt. 1**

**281-796-9643**

**Logistics Coordinator Export (Oil & Gas Industry).**


**Dear Officer in Charge,**

My name is Brandon and I am a longtime friend of Chanthol Chem. I have known him Chan is what most of not all his close friends call him. We grew up together starting since middle school and well beyond high school as we graduated and went our separate ways as adults. Chan is a very good friend of mine we have lost touch in the last 5 years or so as he moved and I moved out of state with my kids. We both grew up together along with some other friends back in Minnesota. I have known him for over 20+ years now.  He is a friend I would not want to see anything bad happen to him. I believe we all make mistakes whether we are influenced in any way or just going through some things in life that cause us to make bad decisions. I know Chan and he is no threat to society he is not the type of guy to kill to hurt someone very badly. I believe he has made some mistakes along the way and has not mad the best choices of people surrounding him. But I believe I am a good influence for him and can help motivate him to good change. I do not believe it is not too late for anyone to change for the good. I would like to see my friend that I have not seen in a long time, but also help him in any way I can to be a positive role model in his life. Whether it is helping him have a place to stay for a while and provide food and shelter for him.

As we were growing up he was always the one to give me positive advice whether it was about girls or just life in general as teenagers we all made a lot of mistakes. He is like a big brother to me and I hold him dear to my heart. If I can help him with some necessities until he gets back on his feet. I believe that my friend could use a fresh start with an old friend. I know that deep down inside he is able to change and turn his life around. No one is perfect in the life. There are some very dangerous and crazy people in this world we live in nowadays, especially here in Texas . I am also seeing road rage, some senseless killings. I have been very cautious myself living here day to day. I can truly say being in Texas the last five years I have seen and heard a lot about some really bad people all over the news. Our society has changed so much. I know my friend Chan is not as bad as some of these people that kill and hurt people for the dumbest reasons or none at all. I would like to see my friend Chan change for the better and he is older now. I believe that can only happen if he is around his family and good friends that will support him and steer him in the right direction.

**Sincerely,**


**Brandon Sisakda**

Dennis Vosburg, 1212 San Felipe, Angleton Tx,


Dear Officer in Charge

 I'm writing you this letter on behalf of Chan Thol Chem. I've known Chem about 3 years. I first met Chem in the Chaplains office at Ramsey Unit in Rosharon TX. I got to know Chem through my interaction in the Chaplains office (Chem was a Chaplains clerk) as I would go in for different things pertaining to programs I was teaching.

 I became a Volunteer Chaplain on the unit which put me in greater contact with Chem. He was always very courteous, had a great grasp of office protocol, and found him very easy to talk to and was a great help to me. You could say he was "the go to man" whenever you had a problem or needed an answer to certain programs pertaining to the Chaplains office. (Knew the computer frontwards and back)

 I became a Faith Base Assistant Director and in time Chem was moved into the Faith Base Dorm which put Chem an I in much greater contact with one another. Chem was a very important part of the Faith base program. We had group two times a month in the dorm and it was nothing to see Chem involved in group discussion and or leading the groups.  In the FBD Chem always got involved in helping others who had know one on the outside to help them. Chem and some others would get together and pool their commissary together to feed those guys who didn't or who had no outside help.

 I consider Chem a brother in Christ. It was nothing to see Chem studying his Bible and at other times unbeknownst to him I would walk by his area in the dorm and see him in prayer.  He's a man who walks the talk and shows those around him that he is a believer not just in word but in deed also. Truly a rare quality in most today.

 Never a day went by that I didn't see a smile on his face, and days when I didn't feel well he'd ask me if I was feeling alright. God has done a great

work in Chem's life and it took prison to get his attention, it's funny how God works. Chem knows what he did to put himself in prison and I truly believe prison has taught him a great lesson that can't be undone. Truly the lesson has been learned.

Chem is a lucky man in that he has the love of his three daughters, a sister, and mother and father all who love him very much, which all live here in the United States. There is know family in Cambodia for which Chem would have contact, because his family is here in the USA. I believe Chem has a lot to offer not only love for his family, but also to the United States. Chem's daughters have grown to depend on their father for emotional support even though it's been over the phone and when he is released monetary support. (His children love their father) His parents are both up in age and are very much depending on Chem when he is released. Chem is a fast learner a hard worker and has a great understanding of computers. Those are qualities we need in the USA.

I consider Chem a close friend and you said be honest in what I had to say about him and I know I have. Please give great consideration to Chem and his plight and please release him back to the United States of America where he can contribute to his family and this great country.


In His Service

Volunteer Chaplain Dennis Vosburg

# 979-864-6756

CLAUDE SUMRALL

1201 SOUTH BEND DR

ALVIN,TEX 77511

RETIRED

DEAR OFFICER IN CHARGE

   MY NAME IS CLAUDE SUMRALL (CERTIFIED VOLUNTEER CHAPLAINS ASSISTANT) FOR T.D.C.J    I AM WRITING ON BEHALF OF CHAN THOL CHEM A#025374511 WHOM I HAVE KNOWN FOR ABOUT  4 YRS.,CHEM WORKED FOR ME AS A CHAPLAINS CLERK IN THE CHAPLAINS OFFICE ON THR RAMSEY UNIT.

   CHEM WAS A PLEASURE TO BE AROUND,COURTEOUS AND RESPECTFUL AND EASY TO GET ALONG WITH.

   CHEM WOULD ALWAYS INQUIRE ABOUT WHAT I THOHGHT ABOUT CERTAIN THINGS ABOUT THE SCRIPTURES, CHEM WOULD ALWAYS ASK ABOUT MY THOUGHTS ABOUT A GOOD MARRIAGE AND RAISING HIS FAMILY ACCORDING TO THE BIBLE.

   CHEM IS A VERY SMART YOUNG MAN. HE KNEW COMPUTERS FROM A-Z HE WAS ALWAYS WILLING TO  HELP WITH ANY PROBLEMS WE HAD IN THE OFFICE.

   CHEM IS A BIBLE BELIEVER AND IS NOT ASHAMED TO SHOW IT TO OTHERS AROUND HIM. I CONSIDER HIM TO BE A BROTHER IN CHRIST. I BELIEVE CHEM HAS A LOT TO OFFER SOCIETY. PLEASE GIVE CONSIDERATION IN  HIS EFFORT TO STAY IN THE UNITED STATES.

IN HIS SERVICE

CVCA CLAUDE SUMRALL

8-1-18

281- 229- 5761

# Exhibit No. 2

# *State of Texas Parole*

# *Certificate*



# State of Texas

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### PARDONS AND PAROLE DIVISION

### Certificate of Mandatory Supervision

| | | | |
|---|---|---|---|
| Date of Issuance: | 05/15/2018 | | |
| Name | | TDCJ# | SID# |
| CHEM, CHANTHOL | | 01747802 | 07284234 |
| Legal county of residence | | Approved county of release | LOCATION |
| DALLAS | | UNKNOWN | Huntsville |
| Cause # | | | |
| F-1000052-W | | | |

The Texas Department of Criminal Justice Institutional Division (TDCJ-ID) of the State of Texas has determined that said offender is eligible for Mandatory Supervision under the provisions of Chapter 508, Texas Gov't. code. THEREFORE, the Texas Board of Pardons and Paroles (Board) hereby orders that said offender be released under Mandatory Supervision and shall immediately report to the office indicated below for supervision:

**CENTRAL COORDINATION UNIT**

P.O. BOX 13401 CAPITOL STATION

AUSTIN, TX 78757

Phone:     (512)406-5356

and shall be permitted to be at liberty in the legal custody of the State of Texas but subject to the orders of the Board and the Texas Department of Criminal Justice Parole Division, and under the rules and conditions of Mandatory Supervision herein. The period of Mandatory Supervision shall be for a period equivalent to the maximum term for which the prisoner was sentenced less calendar time actually served on the sentence. The time to be served under Mandatory Supervision is also calculated as calendar time. The certificate shall become effective when eligibility requirements for Mandatory Supervision under Chapter 508, Tex. Gov't. Code have been met or when Mandatory Supervision is ordered by the Board of Pardons and Paroles.

**STATUTORILY MANDATED CONDITIONS**

Unless otherwise provided, I shall reside in the county in which I resided at the time I committed the offense for which I was sentenced to the Institutional Division, or the county of the offense for which I was sentenced to the Institutional Division if I was not a resident of the State of Texas.

I shall demonstrate an educational skill level that is equal to or greater than the average skill level of students who have completed the sixth grade in a public school in the State of Texas.

I shall submit to testing for alcohol or controlled substances.

I shall reimburse the State of Texas for the costs of any Post Secondary Education Programs in which I participated while in TDCJ.

I shall not communicate directly or indirectly with the victim; go to or near the residence, place of employment, or business of the victim; or go to or near a school, day-care facility, or similar facility where a dependent child of the victim is in attendance.

I shall not intentionally or knowingly communicate directly or indirectly with a victim of the offense(s) for which I was sentenced to the Institutional Division;  not intentionally or knowingly communicate or cause communication in person, by telephone, correspondence, video or audio device, third person, media, or by any electronic means with the victim, a guardian of the victim, or a close relative of the deceased victim of the offense(s) for which I was sentenced to the Institutional Division;  not intentionally or knowingly go near a residence, school, place of employment or a business of the victim of the offense(s) for which I was sentenced to the Institutional Division;  not intentionally or knowingly go to or near a school, day-care facility, or similar facility where a dependent child of the victim of the offense(s) for which I was sentenced to the Institutional Division is in attendance.

**Upon written instruction from my supervising officer:**

I shall participate in a drug or alcohol continuum of care treatment program.

I shall register as a sex offender under Chapter 62, Code of Criminal Procedure.

I shall not go in, on or within a distance specified by a parole panel, of premises where children commonly gather.

I shall not supervise or participate in any program that includes as participants or recipients, persons who are 17 year of age or younger.

I shall attend psychological counseling as specified by my supervising officer.

I shall perform not less than 300 hours of community service at a service project designated by a parole panel.

**SPECIAL CONDITIONS**

C       I shall be prohibited from participating in certain financial transactions as specified by supervising parole officer.

D       Release to Detainer only. At any time that this condition is in effect, and to the extent directed by the supervising parole officer, I shall be released to the custody of the detaining agency; report to the parole division, as instructed, at all times while not in custody on the basis of the detainer; and report immediately to the parole division, as instructed, upon withdrawal or cancellation of the detainer.

I       I must notify a prospective employer regarding criminal history, if position of financial responsibility is involved.

O.49   I shall attend Gamblers Anonymous meetings.



RELEASED TO DETAINING AGENCY
AS PER ATTACHMENT



# State of Texas

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## PARDONS AND PAROLE DIVISION

### Certificate of Mandatory Supervision
### General Conditions of Mandatory Supervision Release

| Name | TDCJ# | SID# |
|---|---|---|
| CHEM, CHANTHOL | 01747802 | 07284234 |

In consideration of the release to Mandatory Supervision granted by the State of Texas, I do hereby accept such Mandatory Supervision. I recognize that my release is conditional based upon my performance of the following terms and conditions:

1. I shall upon release from the institution, report immediately, as instructed to my Parole Officer; thereafter, report as directed and follow all instructions from my Parole Officer.

2. I shall commit no offense against the laws of this State or of any other State or of the United States.

3. I shall reside in a specified place as approved by my supervising officer.

4. I shall not travel outside the State of Texas without the approval of my supervising officer.

5. I shall not unlawfully own, possess, use, sell, nor have under my control any weapon or illegal weapon.

6. I shall avoid persons or places of disreputable or harmful character.

7. I shall not enter into any agreement to act as "informer" or special agent for any law enforcement agency without specific written approval of the Parole Division Director or designee.

8. I shall abide by all Special Conditions imposed upon me by the Board.

9. General Provisions:

   A. I hereby agree to abide by all rules of Mandatory Supervision imposed by Texas or the receiving state including, but not limited to, the requirement that I appear at any hearings or proceedings concerning alleged violations of Mandatory Supervision as required by the law of the receiving state, any state in which I may be found or the State of Texas. I further agree and consent that the receiving state, if I am under the Interstate Compact for Adult Offender Supervision, or any state wherein I may be found while on Mandatory Supervision jurisdiction may conduct such hearings as deemed necessary, proper or which may be required by law.

   B. In the event I am granted the privilege of residing in and being under the supervision of any other state or territory under the Interstate Compact for Adult Offender Supervision pursuant to Texas Government Code, Section 510.07 and/or rules enacted by the Interstate Commission on Adult Offender Supervision and if for any reason I may be outside of the State of Texas in violation of the terms and conditions of mandatory supervision I hereby agree to waive extradition to the State of Texas from any other state or territory jurisdiction in or outside the United States where I may be found. I further agree that I will not in any manner contest any effort by the State of Texas, the receiving state or territory or any other state of territory jurisdiction in or outside the United States, to return me to the State of Texas.

   C. I shall pay, during the period of my supervision, any and all outstanding fines, court costs and fees adjudged against me, to the clerk of the court of conviction, and I agree to provide my Parole Officer with documentation verifying payment of said amounts. I shall pay a supervision fee for each month that I am required to report to a Parole Officer as instructed by my Parole Officer.

   D. In the event I am placed in or allowed to reside in a halfway house or community residential facility, I hereby agree to go directly to and reside in the facility designated by the Parole Division until released by the Division. I shall abide by the rules of the facility and attend all required meetings. I shall not leave the physical confines of the facility and the property thereof, except for traveling to and from work, or as authorized by facility rules. During my stay, I shall pay 25% of my gross income to the facility if required. I shall leave all keys to any motor vehicle that I have use of with facility staff when the motor vehicle is not in authorized use.

   E. As required by the Board, I shall obtain and keep in my possession a Texas Department of Public Safety (DPS) Personal Identification Card or Driver's License. I shall present said identification to law enforcement or Texas Department of Criminal Justice officials upon request.

   F. If I am released to a detainer and deported outside the international borders of the United States prior to the maximum expiration date shown on this Release Certificate, I shall not enter the United States unlawfully. In the event that I gain lawful entry into the United States, I shall report immediately, as instructed to the office shown on this Release Certificate. If at any time prior to the maximum expiration date shown on this Release Certificate said detaining agency fails to exercise custody, I shall immediately upon release (within 24 hours) report as instructed to the office shown on this Release Certificate.

I HEREBY CERTIFY that I fully understand and agree to be bound by each of the conditions under which I am being released. I further understand and agree that a violation or refusal to comply with any of the conditions of supervision may be sufficient cause for revocation of supervision. I understand that when a warrant or a summons is issued that the sentence time credit shall be suspended until a determination is made in such case and such suspended time credit may be reinstated should supervision be continued. **I UNDERSTAND AND AGREE THAT WHILE UNDER SUPERVISION I REMAIN IN THE LEGAL CUSTODY OF THE STATE OF TEXAS SUBJECT TO THE ORDERS OF THE BOARD AND PAROLE DIVISION.**

AGREED AND SIGNED

x _Chem Chanthol_                                      MAY 2 3 2018

CHEM, CHANTHOL                                         DATE

I hereby certify that these rules, regulations and conditions have been explained to the offender and he/she has agreed to abide by the same upon release.

_[signature]_                                          MAY 2 3 2018

PAROLE DIVISION REPRESENTATIVE                         DATE

Page 4

# Exhibit No. 3

# Derivative

# Citizenship

ChanThol Chem A#025374511
Houston Processing Center - B16/14T
15850 Export Plaza Drive
Houston, Texas 77032

June 14, 2018

Re: Request for Citizenship Verification
    ChanThol Chem A#025374511

Dear Immigration Judge,

I, ChanThol Chem, was picked up by an ICE (Immigration and Custom Enforcement) Officer at the Texas Department of Criminal Justice in Huntsville, TX on May 23, 2018 and then transferred to the Houston Processing Center and have been detained here since then. I have been detained prior by ICE back in 1997 while living in the state of Minnesota, where I had grown up. I was released on bond while fighting my case to stay in the United Sates. I apparently had lost my case and an Immigration Judge in Minnesota had issued a final Order of Removal on October 20, 1997. Cambodia did not issue traveling documentations so I was placed on Order of Supervision. Being impatient and ignorant of the laws, in 2007 I signed an order of deportation to get out of detention since ICE had already taken my Permanent Resident card. At the time I did not know that I was possibly a citizen through my parent.

My father, Chem Thlang, was in the Cambodian army back in the mid 1970's and he was fighting on the allied side with the United States against Pol Pot's Khmer Rouge Regime and Vietnam's Viet Cong's. While Cambodia was slowly falling into the Khmer Rouge, my father, Chem Thlang and mother, Samon Kroch decided to flee the country in 1979 with their young children, my older brothers Alec Chem (formerly ChanTha Chem), Christian Chem (formerly ChanThy Chem), myself (ChanThol Chem) and younger sister Chanotdom Chem-Smith. Our family fled by walking hundreds of miles during war time across Cambodia into Thailand, where we remained in a Refugee Camp for nearly 3 years. Through help of refugee relief individuals and sponsors my parents flied paperwork for our family to be accepted by the United States as a political refugee's. We were given authorization to enter the United States in 1983 as permanent residents. All my immediate family currently live in the surrounding suburbs of Minneapolis/St. Paul area of Minnesota.

My father and mother are much older and in poor health but they are lawfully and productive United States citizens as well as my three siblings alongside their respective families. My three young daughters, Katlyn Cox (step-daughter), Kylee Chem and Kirsten Chem are citizens, they currently reside in McKinney, TX with their mother Brande Dixon. My father, Thlang Chem, had obtained his Naturalization Citizenship on March 17, 1993 (see attached documentations with this request). My siblings and I are listed as his legitimate children under his Naturalization Application. I was still a minor going to school while living under his care at our home in Eagan, Minnesota as a legal permanent resident.

For the reasons stated above, I respectfully ask that the U.S. Immigration Court for a verification of my claim as a derivative citizen through my parent. I am pleading release from ICE detention so that I may join my family, return to gainful employment, and no longer be a financial burden to both to society and my family.

Respectfully submitted,

ChanThol Chem
A#025374511

6-14-2018
Date

No. 20495715

CERTIFICATE OF NATURALIZATION

INS Registration No. A25 374 507

Personal description of holder as of date of naturalization:

Date of birth: August 5, 1942

Sex: Male

Height: 5 feet 4 inches

Marital status: Married

Country of former nationality: Cambodia

*Choem Thang*

I certify that the description given is true, and that the photograph affixed hereto is a likeness of me.

*Choem Thang*
(Complete and true signature of holder)

CHEN THEANG

Be it known that, pursuant to an application filed with the Attorney General

at St. Paul, Minnesota

The Attorney General having found that

*[holder]* residing in the United States intends to reside in the United States and, when so required by the Naturalization Laws of the United States, and had in all other respects complied with the applicable provisions of such naturalization laws, and was entitled to be admitted to citizenship, such person having taken the oath of allegiance in a ceremony conducted by the United States District Court

at Minneapolis, Minnesota
on March 17, 1993

such person is admitted as a citizen of the United States of America

*[signature]*
Commissioner of Immigration and Naturalization

# Exhibit No. 4

# *Andrew Bless Letter*

ChanThol Chem - A#025374511
CoreCivic (H.P.C.) - B16/14T
15850 Export Plaza Drive
Houston, Texas 77032

**Andrew Bless**
**Deportation Officer**
**US Department of Homeland Security**
**126 Northpoint Drive, Ste 2020**
**Houston, TX 77060**

July 23, 2018

Dear Officer Andrew Bless,

Sir - I, ChanThol Chem - A#025374511, am requesting your assistance with the below items in regards to my Immigration case.

Minnesota Time-line:
- Date when I was taken into custody by INS (now ICE) in 1996 or 1997 after my release unto parole from Minnesota Department of Corrections?
- Date I bonded out and amount if possible?
- Date placed unto initial Order of Supervision in Minnesota?
- Date in 1996 or 1997 when INS (now ICE) had sent in repatriation request to Cambodian Central Authority government for my travel documents?
- What, if any, was the answer the Cambodian government replied back with on travel documents?

Texas Time-line:
- Date in 2007 when I was taken into custody by ICE for Order of Supervision violation?
- Date in 2007 when ICE had sent in repatriation request to Cambodian Central Authority government for my travel documents?
- What, if any, was the answer the Cambodian government replied back with?
- Date in 2007 of release back unto Order of Supervision?

- Date in 2018 when ICE had sent in repatriation request to Cambodian Central Authority government for my travel documents?
- What, if any, was the answer the Cambodian government replied back with on travel documents?

May I please also get a copy of my **Notice to Appear** as well. I appreciate your help with this matter and look forward to seeing your reply. If you have any questions or concerns please contact me. Thank you again and God bless.

Respectfully submitted,

ChanThol Chem
A#025374511

7/24/18
Date

# Exhibit No. 5

# *Sworn Declaration of*

# *ChanThol Chem*

# SWORN DECLARATION OF CHANTHOL CHEM

I, ChanThol Chem – A#025374511, was taken into ICE custody on May 23, 2018, and have remained in ICE (Immigration and Custom Enforcement) custody continuously at CoreCivic - Houston Processing Center, detention facility located at 15850 Export Plaza Drive, Houston, Texas 77032.

To the best of my knowledge I, ChanThol Chem, swear to the below statement regarding a meeting held with my Deportation Officer Andrew Bless at the CoreCivic (HPC) detention facility on Tuesday, August 7, 2018.

◆ Officer Bless stated: "My 90 day review is coming up in about 15 days and that he had already received some support letters from my family members. But per an email he received from HQ (ICE headquarters) that I am on a waiting list to be interviewed by the Cambodian Embassy sometimes in September/October of 2018. That it would be pointless to release me unto Supervision since ICE may have to re-arrest me for the interview if it happens. That he is considering holding me for another 90 days. That possibly after the interview is conducted and some news come from HQ about the outcome with Cambodian government maybe he would ask for my release unto Supervision. Since my case was so old (from 1997) that obtaining my travel documents were slim and that everything about my case is pretty much handled by HQ any ways." I asked him: "Can my family call or contact the Cambodian Embassy to verify that I am on the Interview list and where I stand on it? He stated: "I am not sure if they can get it or if Cambodian government would tell them anything about my case".

◆ I asked him: "Based on what he said so far if my 90 day review would be denied? He stated: "That it would appear to be so." He wasn't for sure based on his reactions. He mentioned nothing about about being flight or danger risk to the public if I was released or any other reasons to hold me for another 90.

◆ Officer Bless stated "In regards to my letter addressed to him on July 25, 2018 (which he had with him), that he could not answer or provide me with any information - that it is up to me to obtain them. Possibly by going online and filling out some forms to do so. He stress jokingly that he is the "prosecutor" on the case and it's up to me since I'm on the other side to get info about my case. He also could not provide me with a copy of my original NTA (Notice to Appear), that by doing so he would have to do it for everyone else who may request for theirs".

◆ Officer Bless stated: "He received some contact by phone and emails from my family. He showed me an email (on his phone) sent from my sister, Chana Smith. That he would reply back to her, if it was ok by me to share a little info about my case with her. I said: "that's its fine and I would appreciate it".

Please Note: He did not mention of actual date or provided written notice of where I stand on the waiting list for interview by Cambodia. There is approximately over 1,900 Cambodians with Final Order of Removal of which 1,441 with criminal convictions, as of December 31, 2017 per ICE spokesman Brendan Ready (NBC News online article). However, in the 15 years (between 2002 – 2017) since the Repatriation Agreement was signed in 2002, only 575 nationals have been removed as of December 31, 2017, data provided by Khmer Vulnerability Aid Organization. Cambodia has accepted only a limit number of persons for repatriate each year (an average of 47 per year) and still regularly refuses to issue travel documents.

## Declaration Under Penalty Of Perjury

I declare under penalty of perjury that, I wrote this Sworn Declaration, and the information in this declaration is true and correct. I understand that a false statement of a material fact may serve as the basis for prosecution for perjury in a U.S. Court of Law.

ChanThol Chem – A#025374511                     8/8/18
                                                  Date

# Exhibit No. 6

# 90 Day Release

# Request Letter

ChanThol Chem - A#025374511
CoreCivic (H.P.C.) - B16/14T
15850 Export Plaza Drive
Houston, Texas 77032

August 8, 2018

Andrew Bless
Deportation Officer
US Department of Homeland Security
126 Northpoint Drive, Ste 2020
Houston, TX 77060

## **Request for Release**

Dear Officer Andrew Bless,

I want to sincerely thank you for taking the time to visit with me and for answering back to my family's concerns. Most of what you said is part of your job duties and I understand that. This letter is to inform you that I would like to formally request for released from detention. As you know I've been locked up for 7 ½ years in TDCJ (Texas Department of Criminal Justice) thus far and picked up by ICE officials and detained since May 23, 2018. I've been detained two times prior (1997 and 2007) and by the God's favor and grace I am still here in the U.S. and by faith hope to remain here.

In _Lun v. Ashcroft_, U.S. Dist C02-937L (2002) in which Petitioner, recognizes that a repatriation agreement now exists between the U.S. and Cambodia, but argues that there is no indication that the government is likely to issue travel documents for him in the reasonably foreseeable future. Petitioner further argues that the number of aliens awaiting repatriation to Cambodia clearly establish that it will take the INS years to deport them all.

According to an NBC News article, ICE spokesman Brendan Ready, stated as of December 31, 2017, the total number of Cambodian nationals with final orders of removal and awaiting removal was over **1,900** in which 1441 are criminal convictions. However, in the 15 years since the Repatriation Agreement was signed in 2002, only 575 nationals have been removed as of December 31, 2017, data provided by Khmer Vulnerability Aid Organization. Cambodia has accepted only a limit number of persons for repatriate each year (an average of 47 per year) and still regularly refuses to issue travel documents. As of date, I have not been interviewed by the Cambodian Embassy for any possibilities for travel documents nor have their been a written notice sent to me. According to the repatriation agreement, the Cambodian Central Authority is generally supposed to respond to a repatriation request in writing within 30 days of the request. There has been no individualized consideration of my case by the Cambodian government and ICE has indicated no reasonable time period in which removal is likely to occur. ICE recognizes that Cambodia rarely permits repatriation and does so only after conducting interviews and ascertaining the propriety of repatriation on a case-by-case basis. I have written multiple letters to the Royal Embassy of Cambodia concerning the matter.

I do not know the reasons why I have not been considered by the Cambodian government nor where I stand on the waiting list for an interview. As you have stated at our meeting, my case is old (from 1997) and you felt the likelihood of obtaining travel documents for me were slim. You said that releasing me would be pointless on my 90 day review, that ICE may have to re-arrest me for my interview later in the year anyways.

My family and I strongly disagree, this would be a great blessing for us to mend broken hearts and for us to spend time as a family, a complete family even if it is for a few days or months.

Mr. Bless, I am pleading with you as a father, strongly believing that you have the authority with my release – either by input or signing off on it. I am far from perfect, but one of my life's purpose now is to serve and try to lead others to Jesus Christ, to find salvation and peace. While incarcerated I was able to attend multiple classes, programs and worship services to help rehabilitate myself back into society. Please believe me that I have change, that I'm fully committed to learning and growing in the most positive ways possible.

I will do everything humanely possible to report on time, to be at every scheduled meetings or request made by ICE and/or parole. And if the day comes that I need to turn myself in for any interview or deportation, you have my word as a man this will be done! **If released**, I will live with my friend Brandon Sisakda until Texas parole approves my Interstate-Compact to Minnesota (his address is 14141 Champion Drive #1, Houston, TX 77069 – (281 – 796 -9643). Then I will live with my sister, Chanotdom Chem-Smith and brother-in-law, Calvin Smith, at their home address located at 15300 Oak Ridge Circle SE, Prior Lake, MN 55372 – (952) 212-8658.

For the reasons stated above, I respectfully request that the I be released to Order of Supervision so that I may rejoin my family, in particular my daughters. It breaks my heart to hear my daughters tell me how much they miss me and need me out there. Give me an opportunity to become a productive person and no longer a financial burden to taxpayers, society or my family. You should already have support letters from family and friends, but I've attached one in particular to this letter for your review again.

*I thank you for your time and any and all considerations – God bless.*

Respectfully submitted,

ChanThol Chem
A#025374511

8/8/18
Date

CC: Stephanie Lynn - HQ RIO Detention Unit
Mark Siegl – Houston Field Office Director
Tony Bryson – Houston District Director
File

# Exhibit No. 7

# *NBC News Online Report*



Asian America

## As Cambodian deportations resume, community looks for ways to cope

 As of December 2017, there were more than 1,900 Cambodian nationals with final orders of removal residing in the United States, according to an ICE spokesman.
by Agnes Constante / Apr.20.2018 / 10:13 AM ET

Sothy Kum learned that he was being deported to Cambodia an hour before he boarded the bus that took him from an immigration detention center to an airport in El Paso, Texas, he said.

The 43-year-old didn't have time to call his wife or change clothes beforehand, he added, and after more than 20 hours of travel, arrived in an unfamiliar country his family fled when he was about 2.

"Everything here is just totally the opposite in the U.S.," Kum said. "The traffic, the way they ride their moped and go the wrong way. There's no stoplight."



Sothy Kum with his wife, Lisa, and the couple's daughter.Courtesy of Lisa Kum

Kum was one of 43 Cambodian nationals who landed in the country on April 5 after being deported from the U.S.

Staff from the nonprofit Southeast Asia Resource Action Center (SEARAC), which has been advocating for the individuals, said it was the largest group of people the organization has seen deported in a single day since a 2002 agreement between the U.S. and Cambodia.

"This recent group of removals ... was very devastating to the community," Katrina Dizon Mariategue, SEARAC's immigration policy manager, said. "We are very heartbroken for a lot of these family members, but we continue to stay hopeful."

Our entire family was extremely traumatized when they knocked on our door one morning and took him away from us.

The flight came about five months after civil rights advocates filed a lawsuit challenging the immigration detention of Cambodian nationals, many of whom came to the U.S. as refugees fleeing the Khmer Rouge. Late last year, Immigration and Customs Enforcement (ICE) detained more than 100 Cambodian nationals with orders of removal, according to advocates.

A possible victory for some of the plaintiffs came Tuesday when the Supreme Court struck down part of a federal law that makes the deportation of immigrants convicted of certain crimes easier.

Christina So, strategic communications at Asian Americans Advancing Justice-Asian Law Caucus, one of the groups that filed the lawsuit, said the ruling will certainly be helpful for class members.

Phi Nguyen, litigation director at Asian Americans Advancing Justice-Atlanta, which, along with other groups filed a similar lawsuit on behalf of Vietnamese nationals, said that if an individual received their deportation order based on one of the crimes covered in the case, they have the ability to revisit and re-open their removal order.

**Related**

NBC Asian America Presents: Deported

Both So and Nguyen said their organizations still need to more closely examine the specific cases.

 As of December 2017, there were more than 1,900 Cambodian nationals with final orders of removal residing in the United States, 1,441 of who have criminal convictions, according to ICE spokesman Brendan Raedy. 

Community organizations have warned that 200 Cambodian nationals could be deported this year. ICE declined to comment on the figure, saying it would be speculation.

"Any removals would have to be coordinated with, and approved by, the Cambodian authorities," Raedy said in an email.

## Community response

Following the rise in detentions and deportations in the Southeast Asian community, a group of organizations submitted a Freedom of Information Act request to ICE earlier in April asking for detailed information about arrests, detentions and removals.

The Phnom Penh-based Khmer Vulnerability Aid Organization (KVAO), a non-governmental organization that assists deportees transitioning to life in the country, has also increased its capacity by renting additional space and hiring more staff, Bill Herod, an adviser to the group said in an email.

# Exhibit No. 8

# *Channel News Asia*

7/24/2018
Case 4:18-cv-03281 Document 1 Filed in TXSD on 09/13/18 Page 52 of 62
Up to 200 Cambodian American deportees expected in 2018 as US repatriates more immigrants - Channel NewsAsia

Asia

# Up to 200 Cambodian American deportees expected in 2018 as US repatriates more immigrants

Cambodian Americans who have committed a crime face possible deportation from the country they now call home.



Father-of-five Jimmy Heim had spent nearly 40 years in the United States when he was deported to Cambodia, a place he barely knew. He is part of the growing community of Cambodian-American returnees, whose number is expected to rise by up to 200 this year. (Photo: Pichayada Promchertchoo)

By Pichayada Promchertchoo (/author/7576756)
15 Apr 2018 06:33AM
(Updated: 15 Apr 2018 12:23PM)

Bookmark

PHNOM PENH: Loneliness can be frightening.

It is how Jimmy Heim felt in August 2016 when he was flying from the United States to a place he barely knew. Every second took him further away from his entire existence as a US resident. Everything he had built up over nearly 40 years – his wife and five children, his job, his house and friends – were ripped

7/24/2018 Cambodian Americans who grew up in the US are being deported as Cambodia resumes accepting its immigrants - Channel NewsAsia

Case 4:18-cv-03281 Document 1 Filed in TXSD on 09/13/18 Page 53 of 62

Based on data from the Khmer Vulnerability Aid Organization (KVAO), a leading Cambodia-based humanitarian group supporting deported Cambodian Americans, their numbers are on the rise. The arrivals went up from 36 in 2002 to 88 in 2011. Although the number dropped to 37 last year, it was only because Cambodia refused to accept its deported nationals.



**PEOPLE DEPORTED FROM US TO CAMBODIA**

Infographic by Rafa Estrada    Source: KVAO

In response, the US government under President Donald Trump imposed visa sanctions on Cambodian foreign ministry officials and their families in September. The move successfully pressured Cambodia to resume the repatriation process. With the programme back on track, 61 Cambodian Americans have already been deported since the start of 2018. More than 100 others are also expected to be pushed out of the US by the end of this year.

"There are still a lot of Cambodians who are serving their sentences in the US. From what I know, there are about 1,000-2,000 of them," said Cambodian interior ministry spokesman Khieu Sopheak.

*We can't abandon them since they're Cambodian. But honestly, we don't want to take them back. We want them to live there.*

**'UNJUST, IMMORAL, UNETHICAL'**

Since 2002, the US government has deported 638 Cambodian nationals. Many of them are children of refugees who fled Cambodia during the oppressive rule of the Khmer Rouge in the late 1970s, when almost a quarter of the population was wiped out in a four-year genocide.

Heim was five years old when his family escaped the regime's atrocities. Many other children were born in refugee camps and resettled in the US, unaware of the importance of acquiring US citizenship for which they were eligible. A great number of them did not know they could be deported and had never set foot in Cambodia until they were repatriated decades later.

"These are Americans of Cambodian heritage," said Bill Herod from KVAO.

> *Culturally, they're Americans. They eat American food, listen to American music, tell American jokes and watch American movies. They all speak Khmer – some not so well and others with the West Coast accent – but they're Americans.*

Adjusting to a new life is tough for many deportees. What connects them most to the country is perhaps their Cambodian nationality and, for the likes of Heim, limited Khmer vocabulary.

A great number of the deportees feel ashamed and try to hide from their past, fearing they would be discriminated against if people found out who they really are.

Heim kept his past secret when he first arrived in Phnom Penh. He rarely left his house or mingled with the locals and often felt the need to repeat the lie commonly told by deportees, that he was only visiting and would go back in a year or two, knowing that day would never come.

> *I had to play that role because if they knew I'm one of the rejects, they wouldn't even want to talk to me and might mistreat me, you know, or, in some kind of way, I wouldn't get that opportunity.*

"All locals looked at me strangely because I'm tattooed and bald," he added. "I was alone."

This aspect of the programme has prompted some commentators to criticise Washington for what seems like double punishment against its legal permanent residents who have already served prison sentences in the US.

Several ex-convicts were deported for crimes they committed as minors, according to Herod. Numerous cases, he said, involve trivial, non-violent misdemeanours considered felonies under US immigration law. Some deportees had been released for years and already resumed their normal lives – with a family, house and stable job – when they were forced to leave everything behind.

# Exhibit No. 9

# *Royal Embassy of*

# *Cambodia Letters*

ChanThol Chem - A#025374511
CoreCivic (H.P.C.) - B16/14T
15850 Export Plaza Drive
Houston, Texas 77032

**Royal Embassy of Cambodia**
**4530 16th Street NW**
**Washington, DC 20011**

RE: Immigration Status

July 11, 2018

To Whom It May Concern,

My name is ChanThol Chem and I am writing to ask your office for assistance concerning my plight with my immigration status within the United States. I am currently being held at an ICE (Immigration and Custom Enforcement) Detention Center (CoreCivic – CCA) in Houston, TX since May 23, 2018.

I was convicted of felony aggravated robbery in 1994 (Eagan, MN), served 42 months on 58 months sentence. After release unto parole from Minnesota Department of Corrections, I was picked up by INS (now ICE) for deportation proceedings in Appleton, MN. My family bonded me out to fight my case but in the end we lost and I was Ordered Deportable by an Immigration Judge on October 10, 1997. We did not appeal, as far as I know. I was placed on Order of Supervision since Cambodia would not accept my removal since 1997. I had violated Supervision once for not reporting, was picked up in August 2007. Was held for 90 days then released back unto Supervision. I was convicted of felony theft in 2011 (Dallas, TX), served 7 ½ years on a 10 years sentence. After release unto parole from Texas Department of Criminal Justice, I was then picked up by ICE on May 23, 2018 and transferred to my current location here in Houston, TX. I have tried to claim derivative citizenship through my father as he became a citizen in 1993 while I was still a minor. But Immigration Law INA 320 (time frame between 1952 – 2001) states that both parent had to be naturalized while I was a minor, my mother didn't naturalized until 2006.

I have been detained two times prior to this occurrence (roughly 90 days each) in the past by ICE since the order of removal back in October 10, 1997. I have been cooperative and provided ICE deportation officers in the past and present with all pertain information about when and where I was born, and how entered into the Unites States. Provided family history, photographs, fingerprints, identities and signed for travel document application and other related paperwork's. To date, however, ICE has not been able to remove me to my native country of Cambodia. While I am not looking to be deported from the US, I've been cooperative with the authorities.

I have been separated from my family for too long, especially my parents and daughters. My parents have already dealt with the heartaches of losing family, particularly their two oldest daughters - they can not afford lose another child. I thank you for any and all help and considerations – may God bless you all.

Respectfully submitted,

ChanThol Chem                    7/11/2018
A#025374511                      Date

## CERTIFICATE OF SERVICE

I, ChanThol Chem, swear that I did serve the Royal Embassy of Cambodia at the below address with the attached document by US First Class mail on the date indicated below.  I certify this under penalty of perjury.

**Royal Embassy of Cambodia**
**4530 16th Street NW**
**Washington, DC 20011**


_____     _____
ChanThol Chem                              Date   7/11/18
    A#025374511



**KINGDOM OF CAMBODIA**
NATION - RELIGION - KING

ROYAL EMBASSY OF CAMBODIA
TO THE UNITED STATES OF AMERICA
WASHINGTON, D.C.

Washington DC July 23, 2018

ChanThol Chem.
A# 025374511.

Dear Chan Thol,
We acknowledged receipt of your letter dated July 11, 2018,
but we do not understand what you need from our
office.
With regarding to deportation procedure, base on MOU between
US Government and Cambodia, the US side has to
send request to Cambodia Government. After receive
a request for travel document, Cambodia side will
arrange with US to send officers from Cambodia to
conduct a verification interview. Then Cambodian officer
will decide how many the travel the documents will
issued out for deportee. This process is take more
time. Any question you may reach our office as phone
below. or contact MS. Yolanda Harrison, detension and deport
Best regards officer. at 202-732-3491 (desk).
Consular office.

ChanThol Chem - A#025374511
CoreCivic (H.P.C.) - B16/14T
15850 Export Plaza Drive
Houston, Texas 77032

Royal Embassy of Cambodia
4530 16ᵗʰ Street NW
Washington, DC 20011

RE: Immigration Status

August 7, 2018

Dear Ms. Yolanda Harrison,

    My name is ChanThol Chem and I am writing to ask your office for assistance concerning my plight with my immigration status within the United States. I had sent a letter to the Embassy office on July 11, 2018 and they replied back on July 31, 2018 to contact you if I had further questions. I am currently being held at an ICE (Immigration and Custom Enforcement) Detention Center (CoreCivic – CCA) in Houston, TX since May 23, 2018.

    I entered the United States of America (U.S.A) on January 27, 1983 at the age of 7 years old as a refugee under my parents guardianship, father, Chem Thlang, and mother, Samon Kroch alongside my two older brothers and younger sister. I was 3 years old when my family and I walked across Cambodia, arrived and lived at a refugee camp in Thailand while my family waited for relief assistance. My parents had sent out numerous letters to various countries pleading for relief but held hope for an answer from the United States of America. My father had fought as a soldier on the allied side with the United States during the Vietnam War. We were sponsored to enter the U.S. and then granted Legal Permanent Resident status shortly afterwards. My parents lost all their family during the fall of Cambodia to the Khmer Rouge, including my two older sisters. I grew up in the surrounding suburbs of St. Paul, Minnesota - attended grade school through high school then moved to Texas when I was 25 yrs old. My primary language is English in all aspects and I am not fluent in speaking nor writing Cambodian. I have no ties of any kind or family living in Cambodia. I am really technically and legally without a country except the United States because my parents entered the U.S. as refugees. My parents and three siblings are all U.S. citizens, they all live in the surrounding suburbs of Minneapolis/St. Paul of Minnesota. My three daughters (all under 18 years old), Katlyn Cox, Kylee Chem, and Kirsten Chem were all born in the United States (Dallas, TX suburbs). They currently reside in McKinney, TX with their mother Brande Dixon my ex-wife (common law). For over the past 7 years since my incarceration and immigration detention they have grown up without their father's emotional, physical and financial support. My parents are getting older and their health have been declining but continue to be lawfully productive citizens.

    I was convicted of felony aggravated robbery in 1994 (Eagan, MN), served 42 months on 58 months sentence. After release unto parole from Minnesota Department of Corrections, I was picked up by INS (now ICE) for deportation proceedings in Appleton, MN. My family bonded me out to fight the case but in the end we lost and I was ordered deported by an Immigration Judge on October 10, 1997 and I did not appeal. I had violated Supervision once for not reporting, was picked up in August 2007 and was held about 90 days then released back unto Supervision. I was convicted of felony theft in 2011 (Dallas, TX), served 7 ½ years on a 10 years sentence. After release unto parole from Texas Department of Criminal Justice, was picked up by ICE on May 23, 2018 and transferred to the current location here in Houston, TX. I have tried to claim derivative citizenship through my father as he became a citizen in 1993 while I was still a minor. But Immigration Law INA 320 (clause time frame between years 1952 – 2001) states that both parent had to be naturalized while I was a minor, my mother didn't naturalized until 2006. Though current INA 320 (Child Act 2001) I would be consider a citizen. I have been detained two times prior to this occurrence (approximately 90 days each) in the past by ICE since the order of

removal back in October 10, 1997. I was placed and have been on Order of Supervision since 1997 because Cambodia would not issue travel documents for my removal. I have been cooperative and provided ICE deportation officers in the past and present with all pertain information about when and where I was born, and how I entered the Unites States. Provided family history, my photographs, fingerprints, identities and signed for travel document application and other related paperwork's. To date, however, ICE has not been able to remove me to my native country of Cambodia nor any other country. Which has been approximately 270 days total in detention.

I love and respect every aspect of my Cambodian heritage but my life and responsibilities as a father, son and brother is here in the United States. The last time I saw and lived in Cambodia, I was only 3 years old. I have been separated from my family for too long, especially my parents and daughters. My parents have already dealt with the heartaches of losing their family during the Khmer Rouge genocide in Cambodia, particularly their two oldest daughters - they can not afford the lost of another child here in the U.S. <u>I am not looking to be deported from the U.S., but I've been cooperative with the authorities.</u> I am appealing with your office for any assistance on the below items and for some answers:

- The detrimental of psychological and financial affects to my U.S. citizen parents, daughters and other dependents of my removal. Length of continued residency in the United States – **35 years total**.
- Under International Human Rights Laws with agreement of the United Nations High Commissioner for Refugee that 'Adjustment of Status' does not remove protection as a refugee.
- Due to lack of understanding of criminal and immigration laws proceedings in the United States as a minor with my family and how these laws and proceedings affect ones residency status.
- Evidence of rehabilitation through time spent in worship services, various programs and classes offered while incarcerated. Been granted parole by TDCJ with 2 ½ years remaining on parole time.

- Has the U.S. (ICE) sent a Repatriation request for my removal now or in the past since my Final order of Removal back in 1997? If so when and what were and/or are the answers?
- What are the steps that Cambodia takes regarding deportee's or repatriated refugee's if any? What is the statistics for Cambodians with Final Order of Removal as of date?
- My deportation officer, Andrew Bless, stated on August 7, 2018 that I am on awaiting list to be interviewed by the Embassy or Consulate. Am I on the list and if so when will the interview(s) be held?
- Is Cambodia still deporting back repatriated individuals? Is the 2002 Repatriation Agreement still in affect or has there been any updates and/or possible changes in the works?
- Is there certain criteria that a repatriated Cambodian must meet before considerations to be deported back?

*I thank you for any and all help and considerations – may God bless you!*

Respectfully submitted,

ChanThol Chem
A#025374511

8/7/18
Date

## CERTIFICATE OF SERVICE

I, ChanThol Chem, swear that I did serve the Royal Embassy of Cambodia at the below address with this document(s) by U.S. First Class mail on the date indicated below. I certify this under penalty of perjury.

**Royal Embassy of Cambodia**
**4530 16th Street NW**
**Washington, DC 20011**

ChanThol Chem

8/7/18
Date

# Exhibit No. 10

# *Leitner Study*

6/27/2018. Removing Refugees: U.S. Deportation Policy and the Cambodian-American Community - Leitner Center - Fordham Law

Case 4:18-cv-03281 Document 1 Filed in TXSD on 09/12/18 Page 62 of 62



  

for International Law and Justice

About the Center | Donate | Join Us | Alumni

Home    Programs    Opportunities    Events    Short Courses    Publications    Faculty & Staff    Blog



Leitner News

# Removing Refugees: U.S. Deportation Policy and the Cambodian-American Community



RemovingRefugees@gmail.com

**Washington, DC (June 29, 2010)** – The Walter Leitner International Human Rights Clinic of the Leitner Center for International Law and Justice at Fordham Law School, the Returnee Integration Support Center (RISC) and Deported Diaspora announce the release of a new report, *Removing Refugees: U.S. Deportation Policy and the Cambodian-American Community*.  The report highlights the human rights impact of our current immigration policies through the lens of the Cambodian-American community and is based upon interviews conducted in Cambodia with individuals who have been deported. The Southeast Asia Resource Action Center (SEARAC), a Washington, DC based advocacy organization, has long called for the restoration of fairness to immigration policies and values the important contribution of this report to the comprehensive immigration reform discussion. Access the report here.

Two 1996 Immigration laws, the Antiterrorism and Effective Death Penalty Act (AEDPA) and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) expanded the categories for mandatory deportation and eliminated judicial discretion from the removal process for all "aggravated felons."  The Cambodian American community, largely refugees who arrived in the U.S. in the early 1980s, has been hit especially hard by these laws following the signing of an expansive repatriation agreement between the countries in 2002.

Chi Mgbako, director of the Walter Leitner International Human Rights Clinic, states "The laws are currently inhumane, unjust, and in many instances at odds with international human rights norms. Immigration reform provides an opportunity to address these overly punitive measures."

"These important voices reveal grave acts of human rights violations in our country's broken immigration policies" states Dimple Rana, Co-Founder and Director of Deported Diaspora. "Due process is a core American value. This report demonstrates how essential it is to restore due process to the people and families who seek asylum, freedom and citizenship in the United States."

Doua Thor, executive director of SEARAC, states,  "As a country that values justice and the human rights of individuals, we cannot put off tackling some of the country's most pressing issues such as comprehensive immigration reform – and making sure that reform includes the restoration of judicial discretion."

### ###

The Leitner Clinic aims to train a new generation of human rights lawyers and to inspire results-oriented, practical human rights work throughout the world. We work in partnership with non-governmental organizations and foreign law schools on international human rights projects ranging from legal and policy analysis, fact-finding and report writing, human rights training and capacity-building, and public interest litigation.

SEARAC is a national organization that advances the interests of Cambodian, Laotian, and Vietnamese Americans by empowering communities through advocacy, leadership development and capacity building to create a socially just and equitable society.