# Removing Refugees
## U.S. Deportation Policy and
## The Cambodian-American Community

## Spring 2010

Walter Leitner International Human Rights Clinic
Returnee Integration Support Center
Deported Diaspora



# Contents

Executive Summary ................................................................................................................ i

Recommendations ................................................................................................................ iii

Part One: The Cambodian-American Community ........................................................... 1

Part Two: U.S. Deportation Laws and the 2002 Repatriation Agreement ........................ 3
    I.  1996 Immigration Amendments and the 2002 Repatriation Agreement ................ 3
    II.  Punitive Effects of the 1996 Laws on Cambodian-Americans .............................. 3
    III.  Deportation Under International Law: Proportionality and Refugee Protections ...... 4

Part Three: Problems with the Removal Process ............................................................ 6
    I.  An Overview of the Removal Process ................................................................. 6
    II.  Problems Faced by Cambodian-Americans During Removal ............................... 7
        a.  Inability to Argue Against Removal ........................................................... 7
        b.  Lack of Knowledge about Immigration Status and Deportation ................... 8
        c.  Retroactive Application of Deportation Laws .............................................. 8
        d.  Removal of Non-Violent Offenders ........................................................... 9
        e.  Removal of Individuals with Mental Disabilities or Mental Illnesses ............ 10
        f.  Extensive Periods Spent in Immigration Detention ..................................... 12

Part Four: Effects of Deportation ................................................................................ 13
    I.  "Phases" of Adjustment ...................................................................................... 13
    II.  Effects of Deportation ....................................................................................... 14
        a.  Families Torn Apart .................................................................................. 14
        b.  Economic Hardships ................................................................................. 16
        c.  The Impact of Deportations on the Economy .............................................. 18
    III.  Effects of Deportation on Individuals with Mental Illness and Disabilities ............ 19

Part Five: Ramifications for Other Communities ........................................................... 20
    I.  Residual Effects of Violence ................................................................................ 20
    II.  Economic and Acculturation Difficulties ............................................................ 21
        a.  Economic Struggles ................................................................................. 21
        b.  Acculturation ........................................................................................... 21
    III.  Failure to Understand Immigration Status .......................................................... 21

Conclusion ............................................................................................... Inside Back Cover

Acknowledgments .................................................................................... Inside Back Cover

# Executive Summary

Phirun Phal was born in a Thai refugee camp to Cambodian parents who fled the Khmer Rouge and the horrors of genocide. After three years in the camps, his family arrived as refugees in the United States. They initially settled in Philadelphia, Pennsylvania, before moving to Long Beach, California, to join an emerging Cambodian-American community.

Growing up in Long Beach in the 1980s, Phirun faced violence, discrimination, and an ever-rising crime rate. As an adult, he faced financial hardship and forged a $900 check to pay his bills. Even though his record only included two minor, non-violent offenses – possession of a small quantity of marijuana and using his brother's ID for a speeding ticket – the forgery charge made Phirun deportable. He received a sixteen-month sentence, but secured an early release for good behavior after only eight months. On the day of his release, Immigration and Customs Enforcement (ICE) seized him and placed him in immigration detention. After a month, he met with a judge for his deportation hearing. Although Phirun told the judge about his childhood in the United States and his five siblings, his story had no effect. As Phirun noted, "They didn't care – they just care about getting rid of you." He ultimately spent more than a year in ICE custody, during which time his mother passed away from cancer.

Eventually, ICE placed Phirun on supervised release and told him to check in every few months. He returned to Long Beach and started a new life with his long-term girlfriend. He found a job in construction and at the end of 2008, learned that he would soon become a father. The idea of fatherhood excited Phirun and he planned to be present for the birth of his daughter. In the ninth month of the pregnancy, however, ICE arrested him, claiming that his travel documents were ready. On the day of his daughter's birth, they transferred him to a detention facility in Washington State. Three months later, he was deported to Cambodia. He has never seen his baby girl.[1]

Unfortunately, Phirun's story echoes that of many Cambodian-Americans, legal permanent residents (LPRs), and refugees from other immigrant groups. In 1996, the United States introduced two new immigration laws – the Antiterrorism and Effective Death Penalty Act (AEDPA)[2] and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA)[3] – which eliminated judicial discretion from the removal process and expanded the categories of mandatory deportation. In the years since the passage of the two laws, the United States has deported more than 87,000 LPRs.[4] The Obama Administration appears to be continuing rigorous enforcement of the laws, encouraging an increase in overall deportations by setting heightened quotas for ICE, including an agency goal of 400,000 deportations for 2009-2010.[5]

The Cambodian-American community provides a valuable lens through which to explore the harsh effects of these laws and continued policies. In 2002, Cambodia signed a repatriation agreement to accept deportees from the United States. After serving time and reentering society, refugees and LPRs suddenly found themselves eligible for deportation. The U.S. separated them from their homes and families and sent them to a country with which they had little or no connection. As of September 2009, the U.S. has returned 212 such refugees to Cambodia.[6]

Although the United States may deport non-citizens to protect its borders, the experience of the Cambodian-American community highlights how the current U.S. system violates basic principles of equity and reasonableness. It may also infringe upon internationally recognized human rights principles, including proportionality, the protection of refugees, the right to health, and the right to family. This Report urges the United States to reconsider its current approach to deportation and recognize the devastating effects of this policy on refugees, LPRs and U.S. citizens.

The Report is divided into five sections. Part I introduces the Cambodian-American community. Part II will examine the current state of U.S. deportation laws and address the 2002 U.S.-Cambodia Repatriation Agreement that initiated the removal of Cambodian-Americans who were legal permanent residents of the United States. It will also demonstrate how U.S. policy conflicts with international refugee law and principles of proportionality. Part III addresses the problems with the deportation process. Based on interviews with those returned to Cambodia, known as "the returnees," this Report highlights six main issues: (1) the inability of individuals to argue against removal; (2) the use of deportation against non-violent offenders;

---

1    *See generally* Interview with Phirun Phal (pseudonym), in Battambang, Cambodia. (Mar. 25, 2010).
2    Anti-Terrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996) [hereinafter "AEDPA"].
3    Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009 (1996) [hereinafter "IIRIRA"].
4    INTERNATIONAL HUMAN RIGHTS LAW CLINIC, UNIVERSITY OF CALIFORNIA, BERKELEY, SCHOOL OF LAW ET AL., IN THE CHILD'S BEST INTEREST?: THE CONSEQUENCES OF LOSING A LAWFUL IMMIGRANT PARENT TO DEPORTATION 5 (Mar. 2005), http://www.law.berkeley. edu/files/Human_Rights_report.pdf [hereinafter "IN THE CHILD'S BEST INTEREST"].
5    Spencer Hsu and Andrew Becker, *ICE Officials Set Quotas to Deport More Illegal Immigrants*. WASH. POST (March 27, 2010), *available at* http://www.washingtonpost.com/wp-dyn/content/article/2010/03/26/AR2010032604891.html [hereinafter *ICE Officials Set Quotas*].
6    Boomer, A Returnee Rapping Destiny, http://khmerabroad.blogspot.com/2009/09/boomer-returnee-rapping-destiny.html (September 12, 2009).

(3) the returnees' lack of knowledge about their immigration status; (4) the retroactive application of deportation laws; (5) the removal of individuals with mental illnesses and disabilities and finally; (6) the extensive periods of time spent by individuals in immigration detention. Part IV addresses the aftermath of deportation. It documents the adjustment process for those returned to Cambodia and the problems experienced by individuals with mental illnesses and disabilities. It also examines the two biggest challenges faced by both the returnees and their families in the United States: the struggle to adjust to separation from their loved ones and the economic hardships brought on by removal. Finally, Part V discusses the potential effect of U.S. immigration law on other refugee communities.

This Report represents the culmination of a semester-long project undertaken by the Walter Leitner International Human Rights Clinic at Fordham University School of Law (Leitner Clinic),[7] in conjunction with the Returnee Integration Support Center (RISC)[8] and Deported Diaspora.[9] In March 2010, a team from the Leitner Clinic spent one week conducting fieldwork in Phnom Penh, Battambang, and the surrounding areas with the assistance of RISC staff. The Report compiles information gathered from individual interviews with forty-eight of the returnees currently living in Cambodia. Despite having obtained oral informed consent, the authors of the report respect the privacy interest of interviewees, and pseudonyms have been assigned accordingly.

The Leitner Clinic equips Fordham Law students with the necessary skills to become effective human rights advocates and public interest-minded lawyers through its work in partnership with non-governmental organizations and foreign law schools on projects ranging from legal and policy analysis, fact-finding and report writing, and human rights training and capacity-building. Based in Phnom Penh, RISC is one of the only organizations working with the returnees in Cambodia. It helps new arrivals integrate into Cambodian society and provides assistance with documentation, employment and housing. Founded in 2008 and based in Boston, Massachusetts, Deported Diaspora strives to raise awareness about current U.S. deportation policies through community organizing, education and activism.

With immigration reform recently elevated to the status of a national priority, robust debates continue to take place regarding the terms and scope of such legislation. This discussion has centered largely on issues pertaining to illegal immigration, ignoring and overlooking the plight of legal immigrants living in the U.S. The following recommendations are made with the belief that truly *comprehensive* immigration reform must include provisions to remedy the issues highlighted in this report; issues that plague the Cambodian-American community now, and may plague other refugee communities in the future.

---

7    *See generally* Walter Leitner International Human Rights Clinic, http://leitnercenter.org/programs/WLIHR/ (last visited May 19, 2010).
8    *See generally* Returnee Integration Support Center (RISC), http://www.risccambodia.org/ (last visited May 11, 2010).
9    *See generally* Deported Diaspora, http://www.deporteddiaspora.org/ (last visited May 11, 2010).

# Recommendations

## TO THE PRESIDENT AND THE DEPARTMENT OF STATE:

- Encourage Congress to amend AEDPA and IIRIRA to reflect international human rights norms.
- Scale back the Administration's current enforcement efforts until adequate safeguards, such as discretionary hearings, have been introduced to prevent unwise or unjust deportations.
- Modify the U.S.-Cambodia Repatriation Agreement to exclude deportations of individuals who arrived in the United States as refugees.

## TO CONGRESS:

- Amend AEDPA and IIRIRA to:
  - Remove the laws' retroactive effects.
  - Revert to pre-1996 definitions of deportable crimes and ensure that non-violent and misdemeanor offenses do not count towards removability.
  - Reinstate the pre-1996 discretionary rules that allow judges to consider social and humane considerations on behalf of the non-citizen. Factors for discretionary relief include:
    - Evidence of rehabilitation.
    - Contributions to U.S. society (i.e. military service).
    - Length of residency in the United States.
    - Effect of removal on U.S. citizen children and dependents.
- Ensure that those with mental disabilities or mental illnesses receive competency adjudications within the removal process.
  - Allow immigration judges to appoint guardians ad litem for individuals with limited capacity in immigration proceedings.
  - Amend the competency standards for immigration proceedings to reflect similar standards in criminal court.

- Allow immigration judges to consider the availability and quality of necessary health treatments and services in the receiving country.
- Ensure that those properly deported from the United States receive necessary paperwork, including medical and immigration records.
- Amend U.S. immigration laws to reflect international standards and specifically, the ruling of the United Nations High Commissioner for Refugees that adjustment of status does not remove refugee protections under international law.

## TO THE DEPARTMENT OF HOMELAND SECURITY AND ITS IMMIGRATION BRANCHES:

- Ensure that United States Citizenship and Immigration Services adjustment officers consistently inform non-citizens of the rights and responsibilities of becoming a legal permanent resident when they complete the status adjustment process.
- Encourage the immigration enforcement divisions to follow statutes and regulations as written, specifically:
  - Ensure custody reviews within 90 days of immigration detention.
  - Encourage immigration enforcement to exercise discretionary authority to leave persons with mental disabilities in their current care situations until the date of their immigration proceedings.
- Ensure that detained immigrants have the ability to maintain attorney-client and family relationships. This could be accomplished by reducing the number of immigration detainees transferred to remote jurisdictions.
- Eliminate numerical quotas or goals for annual deportations.

# Part One: The Cambodian-American Community

The United States and Cambodia have a long and complicated history. Throughout the Vietnam War, the U.S. maintained Cambodia as an ally and strategic partner.[10] However, U.S. involvement destabilized Cambodian politics and contributed to the rise of the Khmer Rouge.[11] After they took power, the Khmer Rouge began a genocidal campaign that eventually claimed 1.4 to 2.2 million lives.[12] They systematically murdered all government officials and those who were considered disloyal, wealthy, tainted by foreign influence, or educated.[13] Those left alive were forced into the countryside to work in labor camps where terrible conditions lead to widespread death due to starvation and overwork.[14]

When the Khmer Rouge finally fell in 1979, hundreds of thousands of displaced Cambodians sought refuge from the atrocities they experienced.[15] The United States provided a new home for 120,000 of these refugees, dramatically expanding the Cambodian-American community in the late 1970s and early 1980s.[16] In April 1975, fewer than a thousand Cambodians lived in the United States.[17] Refugees who settled in the U.S. arrived in two distinct groups: the 1975-1979 arrivals and the post-1979 arrivals.[18]

The first wave of Cambodian immigration occurred in 1975. It primarily included those who were outside of the country when the Cambodian government fell, such as diplomats, military officers, and students.[19] Compared to the second wave of refugees, this group, known within the community as "the 75 people," had a number of key

advantages.[20] For instance, they tended to be educated professionals with some knowledge of English.[21] It was also a numerically small group that arrived at a time when social aid programs were available for resettlement and adjustment.[22] Finally, and perhaps most importantly, "the 75 people" left Cambodia before the genocide and thus did not bear the scars of living under the Khmer Rouge.[23]

The second, and much larger, wave occurred after the fall of the Khmer Rouge. The post-1979 arrivals, known within the community as the "after 80 people," had vastly different backgrounds from their predecessors.[24] They were primarily rural agriculturalists with little to no formal education or English language skills.[25] Moreover, many had severe psychological and emotional trauma brought on by their experiences under the Khmer Rouge and in the refugee camps along the Thai border.[26]

Although these later arrivals needed extensive assistance from social services, there was little help to be found from either the existing Cambodian-American community or the U.S. government.[27] Due to their limited numbers and resources, the "75 people" could provide only minimal support to later waves of refugees.[28] The government also provided less help than it had to the first wave of Cambodian refugees. By the 1980s, the U.S. government had changed its approach to welfare, readjusting its focus towards preventing dependency on government assistance rather than changing the structural conditions affecting dependent communities.[29] While "the 75 people" had received

---

10  *See, e.g.* LIBRARY OF CONGRESS, COUNTRY STUDIES: CAMBODIA, (2009), http://lcweb2.loc.gov/frd/cs/khtoc.html (follow link to "Nonaligned Foreign Policy); Bill Ong Hing, *Detention to Deportation: Rethinking the Removal of Cambodian Refugees.* 38 U.C. DAVIS L. REV. 891, 938 (2005); Kenton J. Clymer, THE UNITED STATES AND CAMBODIA 1969-2000: A TROUBLED RELATIONSHIP 2 (Routledge Curzon 2004).

11  For instance, the U.S. conducted a secret bombing campaign that devastated the villages in the countryside, resulting in a loss of property and lives.  These bombings had such a destructive effect on the Cambodian people that they initially welcomed the Khmer Rouge and their promise of peace. *See, e.g.* Taylor Owen & Ben Kiernan, *Bombs Over Cambodia, The Walrus* (Canada), (Oct 2006) at 67, *available at* http://www.yale.edu/cgp/Walrus_CambodiaBombing_OCT06.pdf; Samantha Power, A PROBLEM FROM HELL: AMERICA AND THE AGE OF GENOCIDE 92 (Harper Perennial 2002).

12  Sharp, Bruce, *Counting Hell: The Death Toll of the Khmer Rouge Regime in Cambodia*, http://www.mekong.net/cambodia/deaths.htm.

13  David Roberts, *US Intervention in Cambodia From Bombs to Ballots*, COVERT ACTION Q., Fall 1997.

14  Clymer, *supra* note 10, at 161-162

15  Power, *supra* note 11, at 142

16  Susan Needham & Karen Quintiliani, *Cambodians in Long Beach, California: The Making of a Community*, 5 JOURNAL OF IMMIGRANT & REFUGEE STUDIES 29, 37 (2007).

17  Sucheng Chan, SURVIVORS: CAMBODIAN REFUGEES IN THE UNITED STATES 81 (2004).

18  Needham & Quintiliani, *supra* note 16, at 37.

19  Chan, *supra* note 17, at 82.

20  Needham & Quintiliani, *supra* note 16, at 37.

21  *Id.*

22  *Id.*

23  *Id.; see also* Chan, *supra* note 17, at 82.

24  *Id.*

25  *Id.* Most of the men had the equivalent of a 4th grade education, while the women had received little to no schooling.

26  Chan, *supra* note 17, at 230-31.

27  Needham & Quintiliani, *supra* note 16, at 38.

28  *Id.*

29  *Id.*

unlimited Refugee Cash Assistance and Refugee Medical Assistance support from the federal government, "the after 80 people" experienced dramatic cutbacks.[30]

When programs were available through private charities or associations funded by the earlier wave, they were typically overburdened and understaffed.[31] A community college in Long Beach, California, for example, reported that in the fall of 1981, 275 Cambodians attempted to register for a vocational training course with only 30 seats.[32] In many cases, refugee assistance agencies:

> often could do little more than pick up refugees at airports and leave them in empty apartments, not returning until days later to see how the frightened and confused newcomers were doing. Because many refugees had never seen a flush toilet, used electricity, cooked on a gas stove, or warmed themselves by a radiator or central heating system, they sat in the dark, went hungry, or shivered in the cold.[33]

The economic climate at the time of the refugees' arrival further exacerbated the situation. The United States experienced a deep recession during the 1980s and jobs were scarce. In many cases, assistance agencies simply could not find employment for the refugees.[34]

Other Cambodian-Americans experienced problems as a direct result of U.S. resettlement policies. Concerned about the creation of large ethnic communities and the burden placed on states by the influx of refugees, the government instituted the "Khmer Guided Placement" or "Khmer Cluster Project" in the spring of 1980.[35] The program was designed to "scatter" a percentage of the new refugees throughout the country, placing groups of three hundred to a thousand Cambodians in small to mid-sized American cities, like Columbus, Ohio and Portland, Oregon.[36] Although the Cluster Project was beneficial for the states in question, it made the transition much more difficult for the refugees themselves. By breaking them into small groups and spreading them around the country, the program isolated the refugees from the rest of the Cambodian community and its associated networks of emotional, physical and economic support.[37] As a result, secondary migration was common amongst post-1979 arrivals and by 1987, almost half of the refugees had moved at least once within the U.S.[38] Many chose to relocate to the emerging Cambodian enclaves of Long Beach, California, Lowell, Massachusetts and Seattle, Washington.[39]

Many Cambodian communities were riddled with crime and poverty. Cambodian youths faced discrimination and harassment by other minority groups.[40] This led to Cambodian youths feeling isolated and in need of a support system.[41] They created their own support system by banding together to protect themselves. Unfortunately tensions between the groups sometimes led to encounters with the police.[42] These incidents led to charges that carried immigration consequences. What Cambodian youths did not know was that these charges would make them deportable under the new immigration laws and the impending U.S.-Cambodian Repatriation Agreement.

---

30   *Id.* at 38-39; *see also* Chan, *supra* note 17, at 105.  Today, refugees are only eligible for 8 months of public assistance.
31   *Id.* at 42.
32   *Id.* at 42 -3.
33   Chan, *supra* note 17, at 99.
34   *Id.* at 156.
35   The program was, ultimately, responsible for the resettlement of 30% of the Cambodian refugees.  *Id.* at 97-98; Needham & Quintiliani, *supra* note 16, at 38-39.
36   *Id.*; Chan, *supra* note 17, at 97-98.
37   Needham & Quintiliani, *supra* note 16, at 41.
38   *Id.*
39   *Id.* Long Beach, California, was popular because of its proximity to Camp Pendleton, an initial point of disembarkation for many of the refugees, and its warm weather. *See* Chan, *supra* note 16, at 85. Lowell, Massachusetts, quickly became a hub because of the state's generous assistance packages and the availability of jobs in the region. *See id.* at 102-105.
40   DORI CAHN & JAY STANSELL, RACE, CULTURE, PSYCHOLOGY & LAW 241-42 (Kimberly Holt Barrett ed., Sage Publications 2005).
41   See e.g. Interview with Dith (pseudonym), in Phnom Penh, Cambodia. (Mar. 22, 2010).
42   Cahn, *supra* note 40.

# Part Two: U.S. Deportation Laws and the 2002 Repatriation Agreement

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act (AEDPA)[43] and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA).[44] These two amendments expanded the categories of deportation to include minor crimes and non-violent offenses and simultaneously eliminated many forms of ameliorative relief. While Cambodian-Americans were technically eligible for deportation as early as 1996, the United States and Cambodia did not have a repatriation agreement until March 22, 2002.[45] As a result of this agreement, Cambodian-American legal permanent residents (LPRs) can now be deported notwithstanding their rehabilitation or the best interests of their U.S. citizen families.

This section will explain the legal context of the Cambodian-American removals[46] and the U.S. Repatriation Agreement with Cambodia. It will then examine the current state of U.S. deportation policies and argue that the laws are punitive rather than regulatory. Finally, it will discuss the international legal ramifications of U.S. immigration laws.

## I. 1996 Immigration Amendments and the 2002 Repatriation Agreement

AEDPA and IIRIRA expanded the categories of deportable offenses. Before 1996, the law limited "aggravated felonies" to specific crimes involving violence and a term of imprisonment greater than five years.[47] After the passage of AEDPA and IIRIRA, so-called "aggravated felonies" became neither "aggravated" nor "felonies." For example, a LPR is considered an "aggravated felon" if s/he is convicted of:

- possessing more than thirty grams of marijuana;[48]

- any crime of theft where the length of imprisonment is more than one year, regardless of whether the term of imprisonment was suspended;[49]

- any crime of violence for which the length of imprisonment is more than one year, even if the State defines the crime as a misdemeanor.[50]

Initially, these changes did not affect Cambodian-Americans because Cambodia refused to accept deported non-citizens. However after September 11, 2001, commentators speculate that the U.S. threatened to pressure the World Bank to withdraw its assistance to Cambodia if the country failed to accept deportees.[51] Many sources believe that it was this pressure that forced Cambodia to sign the 2002 Repatriation Agreement.[52]

## II. Punitive Effects of the 1996 Laws on Cambodian-Americans

These new laws had harsh consequences, especially for LPRs convicted of "crimes involving moral turpitude." Traditionally, these crimes include acts of dishonesty or other "morally questionable behaviors."[53] Even though the 1996 amendments did not change the definition of these crimes, they did increase the consequences of conviction. When interpreted, this vague and sweeping definition renders LPRs deportable for minor offenses such as public urination[54] and riding the subway without a ticket.[55]

AEDPA and IIRIRA eliminated judicial discretion so an LPR who committed a "crime involving moral turpitude"

---

43   AEDPA, *supra* note 2.
44   IIRIRA, *supra* note 3.
45   David L. Cheng, Note, *Émigrés of the Killing Fields: The Deportation of Cambodian Refugees as a Violation of International Law*, 25 B.C. THIRD WORLD L.J. 221, 235 (2005).
46   This report recognizes the distinctions between removal and deportation. However, it will use them interchangeably throughout the text.
47   IIRIRA, *supra* note 3.
48   8 U.S.C. § 1227 (b) (i) (2009).
49   8 U.S.C § 1227 (2)(a) (2009); *See also, United States v. Graham*, 169 F.3d 787, 791 (3d Cir. 1999), *cert. denied*, 528 U.S. 845 (1999) (holding that state misdemeanor petit larceny offense is a theft aggravated felony for illegal reentry sentence enhancement purposes); *U.S. v. Pacheco*, 225 F.3d 148 (2d Cir. 2000), *cert. denied*, 533 U.S. 904 (2001) (holding that state misdemeanor offenses with suspended sentences are aggravated felonies for illegal reentry sentence enhancement purposes).
50   *Wireko v. Reno*, 211 F.3d 833 (4th Cir. 2000) (holding that state misdemeanor sexual battery offense is a crime of violence aggravated felony for removal purposes); *Jaafar v. INS*, 77 F. Supp. 2d 360, 364-65 (W.D.N.Y. 1999) (holding that state misdemeanor petit larceny offense is a theft aggravated felony for removal purposes); *United States v. Christopher*, 239 F.3d 1191 (11th Cir. 2001) (holding that state misdemeanor shoplifting offense is a theft aggravated felony for illegal reentry sentence enhancement purposes).
51   Joe Cochrane, *A Bitter Bon Voyage: America Puts Foreign Criminals on the Fast Track Home*, NEWSWEEK, Aug. 5, 2002, *available at* http://www.searac.org/cambrepnews.html.
52   Id.
53   TRAC Immigration, *available at* http://trac.syr.edu/immigration/reports/155/ (last visited May 10, 2010).
54   HENRY M. JACKSON SCH. OF INT'L STUDIES, UNIV. OF WASH., REFORMING U.S. POLICY TOWARDS REFUGEES, ASYLUM SEEKERS & FORCED MIGRANTS 84 (2010), https://dlib.lib.washington.edu/dspace/bitstream/handle/1773/15595/TF_SIS495A_2010.pdf?sequence=1.
55   BRYAN LONEGAN, N.J. CIVIL RIGHTS DEF. COMM., 1996 WAS A VERY BAD YEAR, *http://www.nj-civilrights.org/literature/1996%20WAS%20A%20VERY%20BAD%20YEAR.pdf*.

of everyone to the enjoyment of the highest attainable standard of physical and mental health."[167] Enforcement bodies, like the Inter-American Commission on Human Rights, hold that the removal of persons with serious medical needs to countries where they cannot receive treatment violates these articles.[168]

This Report recommends that the DHS and the Immigration Branches take necessary precautionary measures when enforcing immigration law against persons with mental disabilities and mental illnesses. Specifically, ICE and the other immigration enforcement branches should exercise their discretionary authority to leave these persons in their current care situations until the date of their deportation hearings. This could help ensure that individuals with special needs continue to receive necessary treatment while awaiting immigration proceedings. In addition, it would reduce the number of persons with mental illnesses and mental disabilities transferred without their medical documentation. This might eliminate dangerous gaps in care and reduce the number of deportees whose health worsens during the immigration process.

This Report urges Congress to reconsider the process available to persons with mental disabilities and mental illnesses in the immigration system. For instance, Congress should standardize the competency standards used by immigration judges. The use of a stricter standard would reduce the number of persons with mental disabilities and mental illnesses deported from the United States by protecting them in immigration courts. If the immigration competency standard looked more like those used in criminal courts, the law could give many deportable non-citizens with mental health issues critical access to counsel and counsel that the civil competency standard cannot guarantee. Furthermore, Congress should require immigration judges to appoint guardians ad litem for those individuals deemed incompetent by the court.

The immigration judiciary also requires better training on the diagnosis and management of cases involving mental illness or disability. This Report urges Congress to require training for immigration judges to address their awareness of deportable non-citizens with mental health issues. Congress should institute diagnostic procedures for ICE and the enforcement branches to separate individuals with mental illnesses and mental disabilities from other non-citizen detainees. ICE should also maintain records of individuals with mental health issues in the immigration system to track their treatment and processing in detention. Congress should also amend AEDPA and IIRIRA to allow immigration judges to consider whether or not deportation will prevent a non-citizen with mental illness or disability from caring for themselves in the country of repatriation. This would reduce the number of individuals with mental illnesses and disabilities deported to countries without adequate care facilities or appropriate medication and would restore humanity to the deportation process.

## F. EXTENSIVE PERIODS SPENT IN IMMIGRATION DETENTION

Another problem returnees faced during the removal process was long periods spent in immigration detention. For example, Kim Ho Ma's scheduled release date came immediately after AEDPA and IIRIRA went into effect. Although the Immigration and Naturalization Service finalized Ma's removal in 1998, they could not deport him. Unwilling to release him to the community, they placed Ma in indefinite detention. In 1999, Ma petitioned to be released on bond to help his handicapped father.[169] This request was denied and he remained in custody for two and a half years.[170] The INS eventually released Ma by order of the Supreme Court of the United States. Within the decision, the Supreme Court held that the INS could not detain deportable individuals for more than ninety days unless it had immediate plans to remove them.[171]

Despite the *Ma* decision, prolonged detention continues to occur. Many of those who arrive in Cambodia spent months, or even years, in immigration detention during the deportation process.[172] This often drained them of resources, energy, and will. By the time they were released

---

167 While the UDHR provides that all people are "free and equal in dignity and rights, it also creates an individual right to a "standard of living adequate for the health and well-being" of oneself and one's family, including "medical care... and the right to security in the event of... sickness, disability... or other lack of livelihood in circumstances beyond [one's] control." UDHR, art. 25, cl. 1, *available at* http://www.un.org/en/documents/udhr/. By signing these instruments, states agree to assume a series of obligations: first, they must "respect the right to health by refraining from direct violations, such as systemic discrimination within the health system; *See also*, Alicia Ely Yamin, JD, MPH, *The Right to Health Under International Law and Its Relevance to the United States*, 95 AM. J. OF PUBLIC HEALTH 1156, 1157 (2005). Second, these obligations also require states to "*protect* [the right to health] from interference by third parties" and to "*fulfill* the right by adopting deliberate measures aimed at achieving universal access to care, as well as to preconditions to health."

168 See, e.g. HUMAN RIGHTS WATCH, RETURNED TO RISK: DEPORTATION OF HIV-POSITIVE MIGRANTS, Prohibitions on Deportation: The Principle of Non-Refoulement (2009), *available at* http://www.hrw.org/en/node/85608/section/4.

169 *Kim Ho Ma v. Reno*, 208 F.3d 815, 819-820 (2000), aff'd sub nom. *Zadvydas v. Davis*, 533 U.S. 678 (2001).

170 Interview with Kim Ho Ma, in Phnom Penh, Cambodia. (Mar. 22, 2010).

171 *Kim Ho Ma*, 208 F.3d 815.

172 See, e.g., Interview with Darany (pseudonym), in Battambang, Cambodia. (Mar. 25, 2010); Interview with Sovannarith Puth (pseudonym), in Battambang, Cambodia. (Mar. 25, 2010); Interview with Vannak S. (pseudonym), in Battambang, Cambodia. (Mar. 23, 2010); Interview with Vichet You (pseudonym), in Battambang, Cambodia. (Mar. 23, 2010); Interview with Atith Neak (pseudonym), in Phnom Penh, Cambodia. (Mar. 23, 2010); Interview with Yim (pseudonym), in Battambang, Cambodia. (Mar. 24, 2010).

or their deportation orders arrived, many of them signed removal papers out of a desire to end the nightmare.[173] Few had either the money or the strength to continue fighting their deportation.[174] This exhaustion often carried over to their early days in Cambodia, when they were at their most vulnerable.

This Report encourages ICE to reduce the number of persons held in immigration detention for periods longer than ninety days. To this end, ICE should ensure that detainees receive legally-mandated custody reviews during the ninety day period. As LPRs, many detainees should receive a bond hearing to determine whether they merit a prolonged stay in immigration detention.[175] This would

only be true if ICE could demonstrate that these individuals pose a threat to civil society.[176] By allowing LPRs to return to their homes and families before deportation, the immigration services would ensure that LPRs settle their affairs and save money for removal.[177]

Furthermore, where possible, this Report recommends that ICE should refrain from transferring detainees to remote districts away from their families and attorneys. These transfers sever both personal connections and important professional relationships, like that between attorney and client or doctor and patient. ICE should ensure that detainees have access to communication and can maintain these valuable relationships in custody.[178]

## Part Four: Effects of Deportation

In 2002, Bunreas "Boomer" Pin arrived in Cambodia in one of the first groups of returnees. Born in a Thai refugee camp and raised in California, he had no connection with the country and struggled to adjust. People judged him on account of his clothes and tattoos, labeling him a gangster and "a screw-up." Although he spoke fluent Khmer, people discriminated against him because of his foreign accent.[179]

Back in the United States, his mother had an equally difficult time. Prior to his incarceration, Boomer took care of the family and its expenses. After his departure, his mother struggled to sustain her livelihood. She faced the challenge of providing for both her children in the U.S. and her son in Cambodia. In addition to financial problems, she felt responsible for his early indiscretions and subsequent removal. Although Boomer and his family ultimately came to terms with his departure, he describes the experience as "seven years of bumpy roads."[180]

This section will address the effects of the post-1996 amendments to AEDPA and IIRIRA on both the returnees and their families in the United States. It will first examine the returnees' adjustment process in Cambodia. It will then discuss the two biggest problems caused by removal:

economic hardships and the break-up of families. Finally, it will address the unique challenges faced by returnees with pre-existing mental illnesses and disabilities.

### I. "Phases" of Adjustment

One of the biggest challenges for returnees is coming to terms with their deportation. Jane Lopacka, a mental health professional in Phnom Penh who works with returnees, described new arrivals as "pretty desperate people, very lonely, and traumatized."[181] Although some returnees have family in Cambodia, they generally do not know their relatives before arriving and have difficulty becoming a part of their lives.[182] Others have no family or friends in the country and must make the transition alone.[183]

Throughout the interviews, the returnees continually described the adjustment process in terms of "phases."[184] At first, the returnees are in denial, unwilling to accept that they are now in Cambodia permanently. Many struggle with depression and post-traumatic stress disorder. Dith

---

173   See, e.g., Interview with Chanthol Y. (pseudonym), in Phnom Penh, Cambodia. (Mar. 22, 2010); Interview with Rith (pseudonym), supra note 141.
174   See, e.g. Interview with Ponleak V. (pseudonym), supra note 112.
175   HUMAN RIGHTS WATCH, COSTLY AND UNFAIR: FLAWS IN U.S. IMMIGRATION DETENTION POLICY,  (2010), available at http://www.hrw.org/en/node/90220/section/4.
176   Id.
177   Id.
178   Id.
179   See Interview with Bunreas "Boomer" Pin, in Phnom Penh, Cambodia. (Mar. 23, 2010).
180   Id.
181   Telephone Interview with Jane Lopacka, Trauma Specialist (Apri 13, 2010).
182   See, e.g., Interview with Rithisak Pich (Pseudonym), in Phnom Penh, Cambodia. (Mar. 22, 2010).
183   See, e.g., Interview with Oudom (pseudonym), supra note 126.
184   See, e.g., Interview with Rithisak Pich (Pseudonym), supra note 182.

arrived in October 2009 and is still coming to terms with his situation. He says that most days, he wakes up and "hope[s] it's just a dream."[185] Other days, he does not "want to wake up at all."[186]

The acculturation struggles of the returnees often compound the shock of arrival. For the most part, the returnees are completely unfamiliar with their new surroundings. Although Cambodia is supposed to be their home, they are little more than tourists, dependent on maps to find their way around.[187] Furthermore, some arrive with no language skills and simply cannot communicate with other Cambodians. Others may have spoken Khmer in the home, but cannot read or write the language. Even those that are fluent struggle to fit in because their accents identify them as foreigners.[188] They are treated like outsiders, not like fellow Cambodians.

Cambodians also judge the returnees because of their appearance. Residents of Phnom Penh and Battambang typically wear long-sleeved shirts and pants, while many of the returnees continue to dress in the style of inner-city Americans, with baggy shorts and t-shirts. Furthermore, most have obvious tattoos. Within Cambodia, tattoos are exclusive to gang members and the local mafia.[189] A number of returnees complained that because of their tattoos, people assumed that they were "gangstas" and feared them.[190]

To cope with the stress of adjustment, many returnees turn to drugs and alcohol. Munny Khlot arrived in 2003 from Long Beach, California. He had no family in Cambodia and struggled to adjust to life in Phnom Penh. He soon found solace in drugs and became a heavy user. As he describes it, "I had nothing to turn to but drugs. I smoked it all." Eventually, he found escape through his work.[191]

According to RISC staff, who have worked with large numbers of returnees, many are like Munny. Initially, they rely on drugs and alcohol but ultimately move on from this phase.[192] Some, however, sink deeper and deeper into addiction and turn to crime to support their habits.[193] As a result, a number of them have been re-arrested and are currently incarcerated in Cambodia.[194]

The returnees described a second "phase" in which they shift their energies from denial to escaping Cambodia. Some want to return to their friends and families in the United States. Others simply want to get out of Cambodia and search for opportunities in neighboring countries.[195]

In the final "phase," the returnees divide. Some accept their life in Cambodia – this may take a few months or a few years. Some never fully adjust, unable to come to terms with their new situation. Since his arrival in 2003, Munny has watched dozens of other returnees struggle to adjust to life in Cambodia. In his experience, "some of the people who come here can't take it. So they hang themselves."[196] Since the deportations began in 2002, at least six of the returnees have committed suicide.[197]

## II. Effects of Deportation

Despite living thousands of miles apart, returnees and their families experience remarkably similar problems. Both sides struggle to adjust to separation from their loved ones and the economic hardships brought on by removal.

### A. FAMILIES TORN APART

Dith was raised by a single mother. Growing up in the crime-ridden neighborhood of Long Beach, California, he searched for male role models. Dith now has a four-year-old son of his own. As a result of his deportation, he must watch as his son faces the same challenge that he once did: growing up in the United States without a father.[198] Munny also left behind a child – a teenage daughter. He worries about her and the effect that his absence may have on her life. He says, "As a father-figure, I should be there for her, but I can't."[199]

For many returnees, the separation from family is the most difficult aspect of deportation. After a lifetime in the United States, the deportees have strong roots and ties

---

185   Interview with Dith (pseudonym), *supra* note 100.
186   *Id.*
187   *See* Interview with Oudom (pseudonym), *supra* note 126.
188   *See, e.g.,* Interview with Dith (pseudonym), *supra* note 100.
189   *See, e.g.,* Interview with Sangha M. (pseudonym), in Battambang, Cambodia. (Mar. 25, 2010).
190   *See, e.g.,* Interview with Phalasath E. (pseudonym), in Battambang, Cambodia. (Mar. 25, 2010).
191   *See* Interview with Munny Khlot (pseudonym), in Phnom Penh, Cambodia. (Mar. 22, 2010).
192   *See* Telephone Interview with Jane Lopacka, *supra* note 181.
193   *Id.*
194   *Id.*
195   *See, e.g.,* Interview with Dith (pseudonym), *supra* note 100.
196   Interview with Munny Khlot (pseudonym), *supra* note 191.
197   *See, e.g., id.; see also* Interview with Rith, *supra* note 141.
198   *See* Interview with Dith (pseudonym), *supra* note 100.
199   Interview with Munny Khlot (pseudonym), *supra* note 191.



**PROFILE: KAMOL SEYHA**

Kamol Seyha arrived in Cambodia in 2007. Several struggles to come to terms with his deportation are specifically the hardest. It first reached the family. He says that because these immigrants obsession that, we don't have choice.

After Seyha told me he was eligible for deportation, Seyha dutifully checked in with ICE every month for two years. Without warning, immigration officials appeared at his house to arrest him. They did not allow him to pack a suitcase, withdraw money or say goodbye to his two sons, aged thirteen and ten. For Kamol Seyha, this one mistake means that they must now grow up without a father.

To this day, he worries that the boys do not understand why he no longer lives in the United States. He wishes that he could tell his sons that he had to leave them because that wanted to. Unfortunately, he is no longer able to communicate with them. Like many other returnees, Seyha's former partner has remarried in the years since his removal. She subsequently cut off all ties with Seyha and has not given him her new address or phone number.

Although he has adjusted to his new life in Phnom Penh, he misses his two sons. He says, "I paid for what I did. I shouldn't take me away from those I love."

*Interview with Kamol Seyha (pseudonym), in Phnom Penh, Cambodia (Mar. 23, 2010).*

to their communities. Deportation destroys these relationships. It forces non-citizens to leave their friends, parents, siblings, and spouses. Furthermore, many must abandon their U.S. citizen children. Of the forty-eight returnees interviewed for this report, twenty-five left behind sons or daughters in the United States.

As U.S. law makes it all but impossible for returnees to obtain a tourist visa, most will never see their children again.[200] After they leave, their relationship with their sons and daughters depends upon the goodwill of their former partners. If a mother disappears with a child, there is little that the returnee can do to locate them again.[201]

Sangha has not spoken with his twin boys in five years. Prior to his removal, he supported his sons and lived with them and their mother. When the United States deported him in 2002, his ex-girlfriend cut off all contact. His only remaining relative in the area is too old and infirm to search for the twins.[202]

Sangha M.'s story highlights a related problem with deportation – the break-up of previously stable families. Of the forty-eight returnees interviewed for the report, twenty were living with their children and partners before their removal. Others supported their parents or siblings. Prior to his conviction, Rithisak Pich helped to take care of his mother and two younger brothers. He regularly set aside money from his paycheck to help with their expenses.[203] After his deportation, his family fell apart. His step-father left and his mother was no longer able to take care of the younger boys. Soon after, the government stepped in and placed his brothers in foster care.[204]

For those left behind in the United States, the break-up of families often results in severe emotional consequences. A survey conducted in 2004 revealed that 70% of deportees and family members exhibited signs of post-traumatic stress disorder, including hopelessness, despair, sadness and shock.[205] When Samlain C. was deported in 2009, his sister broke down and became a heavy drug user. In the words of her mother, she turned to drugs "to replace her pain and broken heart."[206]

For adults, one of the biggest challenges is accepting one's powerlessness to stop the removal. Often, parents will blame themselves and want to protect their children.[207] As previously discussed, AEDPA/IIRIRA do not allow family members to speak on behalf of their loved ones or describe the pain brought on by their removal.[208]

Children struggle emotionally with the loss of their caregiver. When a parent is forcibly removed, children typically fight feelings of abandonment and exhibit signs of anxiety, depression, and fear.[209] Problems are particularly severe when the removal was sudden or unexpected.[210]

---

200  See generally CHRISTINA RODRIGUEZ, IMMIGRATION AND REFUGEE LAW AND POLICY 355 (5th ed. 2009).
201  See, e.g., Interview with Munny Khlot (pseudonym), supra note 191.
202  See Interview with Sangha M. (pseudonym), supra note 189.
203  See Interview with Rithisak Pich (pseudonym), supra note 182.
204  Id.
205  Bryan Lonegan, American Diaspora: The Deportation of Lawful Residents from the United States and the Destruction of Their Families, 31 N.Y.U. REV. OF L. & SOC. CHANGE 55, 72 (2007).
206  Diary of Samlain C.'s mother (pseudonym) (on file with authors).
207  Interview with Bunreas "Boomer" Pin, supra note 179.
208  See generally Morawetz, supra note 56, at 1951. Such a restriction sends a clear message that the effects of deportation on the family simply do not matter to the government. This can, in turn, contribute to a deep mistrust of law enforcement and government agencies amongst the remaining family members.
209  THE URBAN INSTITUTE AND NATIONAL COUNCIL OF LA RAZA, PAYING THE PRICE: THE IMPACT OF IMMIGRATION RAIDS ON AMERICA'S CHILDREN 4 (2007), available at http://www.urban.org/UploadedPDF/411566_immigration_raids.pdf [hereinafter "PAYING THE PRICE"].
210  THE URBAN INSTITUTE, FACING OUR FUTURE: CHILDREN IN THE AFTERMATH OF IMMIGRATION ENFORCEMENT 52 (2010), available at http://www.urban.org/publications/500149.html [hereinafter "FACING OUR FUTURE"].

This emotional trauma can lead to behavioral changes. Unable to understand what has happened, some children will act out and direct anger toward the remaining parent.[211] Others will struggle with lost appetites, weight loss, and changes in eating patterns.[212] Some parents also reported changes in their child's ability to sleep. After the deportation of one or more family members, their children complained about sleeping alone, suffered from nightmares, and began sleepwalking.[213]

The stress of removal can also hurt a child's development and schooling. Early childhood trauma may affect "the thought process, learning, self-perception, and individual feelings about self and others."[214] This can manifest itself in the form of depression, aggression, "sleep disturbance, hoarding food, excessive eating, self-stimulation, rocking, or failure to thrive."[215] Following the deportation of a loved one, young children often stop speaking or refuse to do things for themselves. They may also begin to cling to the remaining parent. Such behavior can impact everything from speech development to toilet training to learning to dress.[216]

The separation of families through deportation, and the emotional and psychological trauma that accompanies the loss, directly implicates international human rights law. International conventions recognize the family as the natural and fundamental unit of society.[217] They require that State parties take appropriate measures to ensure its unity.[218] They also establish key protections for the family, including the right to be free from arbitrary or unlawful interference by the State.[219] Both the United Nations Human Rights Committee and the Inter-American Commission on Human Rights examined the right to family in relation to deportation policies. The Human Rights Committee held that the deportation of a parent from a citizen child constituted "interference" with the family.[220] It also found that the removal of a non-citizen from a country in which he has close relatives may violate the right to family unity.[221]



To address the problem of family separation through deportation, this Report recommends that the United States reinstate the pre-1996 discretionary rules, which allowed an LPR to challenge his or her removal before a judge. Specifically, this Report recommends that the discretionary hearings held before 1996 be reintroduced and required prior to each removal. Within such a hearing, the judge would have the opportunity to weigh the crime in question with the effect that the deportation would have on the LPR's family and U.S. citizen children.

## B. ECONOMIC HARDSHIPS

The returnees and their families also face financial hardships. For those in Cambodia, the struggle for economic survival is not unique. Although the nation's economy is growing, the country continues to battle poverty and unemployment. Independent estimates suggest that the unemployment rate in the country is close to 85%.[222] More than a third of Cambodia's population lives on less than $0.45 (usd) a day.[223] Of these, 90% are located in rural areas, such as Battambang.[224]

211  *Id.* at 51.
212  *Id.* at 52.
213  *Id.* at 52.
214  Lonegan, *supra* note 205, at 72.
215  *Id.*
216  FACING OUR FUTURE, *supra* note 210, at 49.
217  See, e.g., ICCPR, *supra* note 77, art. 23(1) ("The family is the natural and fundamental group unit of society and is entitled to protection by society and the State."); *see also* Universal Declaration of Human Rights, G.A. Res. 217(A)(III), U.N. Doc. A/810 at 71 (1948) [hereinafter "UDHR"], art. 16(3) ("The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.")
218  See generally *id.*
219  See ICCPR, *supra* note 77, art. 17 ("[n]o one shall be subjected to arbitrary or unlawful interference with his privacy, family, or correspondence."); *see also* UDHR, *supra* note Error! Bookmark not defined., art. 12 ("No one shall be subjected to arbitrary interference with his privacy, family, home or correspondence.").
220  See Winata v. Australia, Comm. No. 930/2000, CCPR/C/72/D/930/2000 (Aug. 16, 2000), available at http://www.bayefsky.com/html/120_australia930.php (finding that "a decision of the State party to deport two parents and to compel the family to choose whether a 13-year old child, who has attained citizenship of the State party after living there 10 years, either remains alone in the State party or accompanies his parents is to be considered "interference" with the family"); *see also* Madafferi v. Australia, Comm. No. 1011/2001, CCPR/C/81/D/1011/2001 (Aug. 26, 2004), available at http://www1.umn.edu/humanrts/undocs/html/1011-2001.html (stating that "there may be cases in which a State party's refusal to allow one member of a family to remain in its territory would involve interference in that person's family life.").
221  See generally Aumeeruda-Cziffra v. Mauritius, U.N. GAOR, Hum.Rts.Comm., 36th Sess., Supp. No. 40, Annex 13, at 134, U.N.Doc A/36/40 (1981), available at http://www1.umn.edu/humanrts/undocs/session36/9-35.htm. (Finding "that the exclusion of a person from a country where close members of his family are living can amount to an infringement of the person's right under article 17 of the Covenant, i.e. that no one should be subjected to arbitrary and unlawful interference with his family.")
222  Cambodian Communities Out of Crisis, Facts and Figures about Cambodia (last visited April 30, 2010), http://www.cambcomm.org.uk/ff.html (citing The Economic Institute of Cambodia).
223  UNITED NATIONS DEVELOPMENT PROGRAMME, CAMBODIA HUMAN DEVELOPMENT REPORT 2007: EXPANDING CHOICES FOR RURAL CAMBODIA 9 (2007), available at http://hdr.undp.org/en/reports/nationalreports/asiathepacific/cambodia/Cambodia_HDR_2007.pdf [hereinafter "CAMBODIA HUMAN DEVELOPMENT REPORT"]; *see also* Cambodian Communities Out of Crisis, *supra* note 222.
224  CAMBODIA HUMAN DEVELOPMENT REPORT, *supra* note 223, at 9.

**CASE STUDY: VUTHA**

*[text largely illegible due to degradation]* Before arriving in Cambodia, Vuthy worked as a full-time manager at Sea World to support his wife, three-year-old son and five-year-old daughter. Both children are United States citizens.

Since his deportation in 2007, he has been forced to relocate ... children alone ... not taken on additional jobs and ... The family's rent was recently increased, after she failed to make the necessary payments. Without his salary, she is also unable to afford their current home, and has been forced to move the family.

Although Vuthy has secured employment in Cambodia, he cannot afford to send any money home.

*Interview with Vuthy (pseudonym) in Phnom Penh, Cambodia (Mar. 22, 2010).*

Within this environment, returnees face three unique challenges. First, they typically lack marketable skill sets. The Cambodian economy is focused primarily on agriculture, with 76% of the workforce employed with farming, forestry and fishery activities.[225] Most of the returnees, however, grew up in urban areas and do not have any training in this field. Their experiences are with construction and manufacturing.[226] Although they possess a trade, there is simply no demand for that type of work in Cambodia.

If jobs are available, the returnees may not be considered on account of their U.S. criminal record. Once a person realizes that someone has been deported from the United States, they are often unwilling to consider him or her for employment. In Dith's experience, "people here die to go to the U.S. I had the opportunity and I got sent back – so people here don't want to give me a chance."[227] In attempts to avoid discrimination, some returnees have tried to keep their background hidden.[228] However, this option is only available to those without obvious identifying marks, like tattoos.



Additionally, deportees cannot set up their own businesses. Much of the Cambodian economy is grounded in family connections. The returnees, however, generally lack the sort of social support needed to break through the rampant nepotism.[229] Sothana E. was fortunate enough to arrive in Cambodia with sufficient financial assets to start up his own business. Despite this capital, he has struggled to overcome his lack of connections. He said, "There's no life here – I got $100,000, but I can't start a business because I ain't got no backbone. I open something, they shut me down, they fight me."[230]

The shadow of deportation continues for many years. Even established returnees find themselves held back by their deportation. Oudom adjusted to life in Cambodia by working in a harm reduction program. In 2009, the Australian government awarded him a scholarship to travel to Australia and continue his study of these programs. However, the United States would not provide him with the paperwork on his deportation. As a result, Oudom could not obtain an Australian visa and had to reject his scholarship.[231]

Deportation also has a devastating economic impact on the families and communities left behind. These effects can be grouped into two broad categories: the difficulties associated with the loss of the breadwinner and housing instability.[232]

### i. The Loss of the Breadwinner

Under current U.S. immigration policy, most deportees are men and young boys.[233] These men are often the sole breadwinner for their family, or, at the very least, a significant wage-earner.[234] Of the forty-eight returnees interviewed for this report, eighteen were supporting their family prior to removal.

Unsurprisingly, the loss of this breadwinner can have a disastrous effect on a household's income. According to the 2000 Census, the median income of a non-citizen fulltime worker was $21,264.[235] The median household income for

225 *Id.* at 16.
226 *See, e.g.,* Interview with Kravann Em (pseudonym), in Battambang, Cambodia. (Mar. 25, 2010).
227 Interview with Dith (pseudonym), *supra* note 100.
228 *See, e.g.,* Interview with Rithisak Pich (pseudonym), *supra* note 182.
229 *See* Interview with Sothana E. (pseudonym), *supra* note 88.
230 *See id.*
231 *See* Interview with Oudom (pseudonym), *supra* note 126.
232 Some non-citizens also complained that the deportation of a family member contributed to food insecurity amongst the remaining relatives. Within a study of Guatemalan immigrants, parents and caregivers admitted that they had eaten less or skipped meals for their children in the wake of immigration raids and detention. It can also be difficult for families to rely on donated food. Food banks are, for obvious reasons, not equipped to accommodate cultural diets and some immigrants complained that they were receiving food to which they were unaccustomed. It is unclear, however, to what extent this is applicable to the Cambodian-American community. *See generally* PAYING THE PRICE, *supra* note 209, at 48.
233 Of the 228 deported Cambodian-Americans, only two are women.
234 Families typically lack a replacement for this removed breadwinner. A study of Guatemalan immigrants in Colorado and Nebraska, for example, found that the remaining parent – typically the mother – was less integrated into American society and culture. Most were unable to drive or lacked an official driver's license. They were also unaccustomed to making financial decisions and often did not have access to the family's bank accounts. *See generally* ACLU, WORLDS APART: HOW DEPORTING IMMIGRANTS AFTER 9/11 TORE FAMILIES APART AND SHATTERED COMMUNITIES 3, 42-3 (2004), *available at* http://www.aclu.org/files/FilesPDFs/worldsapart.pdf [hereinafter "WORLDS APART"].
235 AYPAL, JUSTICE DETAINED: THE EFFECTS OF DEPORTATION ON IMMIGRANT FAMILIES 7 (2004), *available at* http://www.urban.org/UploadedPDF/411566_immigration_raids.pdf. The median household income for a "native" family household, in contrast, is $51,179.

non-citizens was $32,515.[236] When one removes this average wage-earner from the family income, the household is left with $11,351 – a number significantly below the 2000 poverty level of $13,874.[237] Even if a returnee finds work in Cambodia, his or her salary is typically insufficient to make up for this drop.[238] Munny currently works full-time, but compares his position to a "summer job." He does not make enough to support himself, let alone his family in the United States.[239]

After the deportation of a breadwinner, families typically rely on savings to survive. Many immigrants, however, live "paycheck to paycheck" and do not have a significant safety net to fall back upon.[240] Deportation of a sibling or spouse also creates a whole new set of expenses for the family. For example, they may now face new travel expenses and the legal costs of defending their loved one.[241]

After deportation, the household may be saddled with the burden of supporting their family member within his or her new country.[242] The majority of the returnees interviewed for this Report received financial support from relatives in the United States. In some cases, this was their only source of income.[243]

Faced with these new challenges and expenses, the family will usually turn to nearby relatives for assistance.[244] People may, for example, limit housing costs by moving in with a sibling or cousin. While this will help the family of the deported person, it places additional economic strain on the relatives, who must now provide for two households.[245] Immigrants may also turn to community groups or religious institutions for help.[246] In the case of the Cambodian-American community, however, there are few organizations in place to provide such assistance.[247]

Finally, legal immigrants can apply to the government for welfare payments, housing assistance and food stamps.[248] As a number of commentators have noted, the harsher removal policies have had the ironic effect of making certain immigrants more dependent on the US government and taxpayers than they were prior to deportation.[249]

### ii. Housing Instability

The deportation of a family member can also contribute to significant housing instability. Immigrants often rent their homes and have difficulty paying the bills on time.[250] In many cases, the deportation of a spouse or sibling forces the rest of the family to live with relatives or to move to a cheaper, smaller house. This instability has a particularly detrimental effect on the family's children, who may have to repeatedly change schools and friends.[251]

### C. THE IMPACT OF DEPORTATIONS ON THE ECONOMY

In addition to the effects on families, deportation may also have a negative impact on the economy as a whole. While the total cost of AEDPA and IIRIRA removals is unknown, immigration detentions and deportations are a significant expense for the government. It costs approximately $97 a day to house someone in immigration detention.[252] The removal process itself averages $1000 per immigrant, but can cost as much as $6000.[253] Given the total number of people affected by the new laws, these deportations represent a significant expense for the United States.

---

236  *Id.* In comparison, the median income for a "native" fulltime worker is $32,082.
237  *Id.*
238  WORLDS APART, *supra* note 234, at 3.
239  *See generally* Interview with Munny Khiot (pseudonym), *supra* note 191.
240  PAYING THE PRICE, *supra* note 209, at 44.
241  Seth Wessler, *Double Punishment*, COLORLINES, Oct. 22, 2009 at 5, *available at* http://www.colorlines.com/article.php?ID=623. Detention centers are often located in the south or southwest, potentially thousands of miles from the immigrant's home. Once a person is actually deported, the family will have to purchase expensive airfare if they want to visit their spouse or sibling in Cambodia.
242  *Id.* at 5. The loss of a breadwinner can also have a damaging economic effect on those family members living in the home country. Communities within El Salvador, for example, have long been reliant upon remittances from relatives abroad. It is unclear, however, to what extent this is applicable to the Cambodian-American community.
243  *See, e.g.*, Interview with Dith (pseudonym), *supra* note 100.
244  PAYING THE PRICE, *supra* note Error! Bookmark not defined., at 45.  It is important to note that not all immigrants have an extended family network within country to rely upon.  *See, e.g.*, Daniel Kanstroom, *Post-Deportation Human Rights Law: Aspiration, Oxymoron, or Necessity?* 3 STAN. J.C.R. & C.L. 195, 215 (2007).
245  PAYING THE PRICE, *supra* note 209, at 44.
246  *Id.* at 46.
247  The organizations include Deported Diaspora and Khmer in Action. They are focused, for the most part, on political advocacy and community education. They cannot provide economic or psychological assistance to the deportees' families.
248  PAYING THE PRICE, *supra* note 209, at 46.
249  *See, e.g.*, Jacqueline Hagan & Scott Phillips, *Border Blunders: The Unanticipated Human and Economic Costs of the U.S. Approach to Immigration Control, 1986-2007* 7 CRIMINOLOGY AND PUBLIC POLICY 83, 90 (2008).
250  PAYING THE PRICE, *supra* note 209, at 47.
251  *Id.*
252  Mike Nizza, *Estimate for Deporting Illegal Immigrants: $94 Billion*, N.Y. TIMES, Sept. 13, 2007, *available at* http://thelede.blogs.nytimes.com/2007/09/13/estimate-for-deporting-illegal-immigrants-94-billion/.
253  *Id.; see also* Stephanie Czekalinski & Jill Riepenhoff, *Sending Them Back: Stepped-Up Deportation Efforts Present Enforcement Challenges*, THE COLUMBUS DISPATCH, Sept. 10, 2008, *available at* http://www.dispatch.com/live/content/local_news/stories/2008/09/10/IMMIG_4.ART_ART_09-10-08_A1_GJB8O0F.html.

## III. Effects of Deportation on Individuals with Mental Illness and Disabilities

While the adjustment process is difficult for the average returnee, it is exacerbated for those living with pre-existing mental conditions. As addressed previously, U.S. deportation policies allow for the removal of individuals with mental illnesses and disabilities. Of the returnees still in touch with RISC, it is estimated that three suffer from schizophrenia, four from other psychotic disorders, two from bipolar disorder and fifteen from severe depression.[254]

One of the biggest challenges these individuals face is obtaining access to treatment and medication in Cambodia. According to Jane Lopacka, only 1% of the country's budget is spent on mental health services.[255] Furthermore, there are only a few clinics and psychiatrists operating in Cambodia and most are located in the capital, Phnom Penh. Within the rural regions, there is little to no access to mental health services.[256]

If a returnee is fortunate enough to live within a reasonable distance of a mental health facility, s/he may still be unable to take advantage of its services. Few arrive with their medical records or can identify their individual condition.[257] Treatment is, in turn, prohibitively expensive.[258] A typical consultation fee in Phnom Penh is $20 or more.[259] While medications are available in the country, they are too costly for the average Cambodian.[260] Returnees, like Sophat Chann, must rely on local NGOs to obtain the required drugs.[261]

Without appropriate treatment, returnees with pre-existing mental conditions struggle to survive. In many cases, the burden of care shifts to their local relatives. The families are, however, rarely in a position to support the returnee, either financially or emotionally. Within Cambodia, heavy stigma attaches to those with mental illnesses and disabilities.[262] Mental health services are, in turn, only viewed as necessary for "crazy people."[263]

If a family is unable or unwilling to care for a returnee, s/he will often end up living alone or on the streets. Although RISC can provide housing for about three to four individuals with mental illness, it is not a mental health facility. The staff are not trained professionals and as a result, often struggle to care for them. When the returnees have violent outbursts or begin to graffiti the walls, the staff can respond in the only way they know how – with patience and kindness.

This Report issues three recommendations to address the problems experienced by returnees with pre-existing mental illnesses and disabilities. First, the United States must amend AEDPA and IIRIRA to ensure that those with mental disabilities or mental illnesses receive competency adjudications. If an individual is found to be incompetent, deportation proceedings must cease immediately. Second, the United States should require immigration judges to consider the availability, and quality, of health care in the receiving nation before ordering removal. If the LPR has a serious or long-term condition requiring treatment, deportation may be inappropriate. Finally, the United States must ensure that all returnees arrive in the receiving country with the necessary paperwork, including immigration and health records.

---

254  Email from Kloeung Aun, Director of RISC, to Erin Miles, student, Walter Leitner International Human Rights Clinic (Apr. 27, 2010) (on file with the authors).
255  Telephone Interview with Jane Lopacka, *supra* note 181.
256  *Id.*
257  *See, e.g.* Interview with Sophat Chann (pseudonym), in Phnom Penh, Cambodia. (Mar. 23, 2010).
258  Telephone Interview with Jane Lopacka, *supra* note 181.
259  *Id.*
260  *Id.; see also* Interview with Lena (pseudonym), in Phnom Penh, Cambodia. (Mar. 26, 2010).
261  Telephone Interview with Jane Lopacka, *supra* note 181; *see also* Interview with Sophat Chann (pseudonym), *supra* note 257.
262  Telephone Interview with Jane Lopacka, *supra* note 181.
263  *Id.*

# Part Five: Ramifications for Other Communities

Until this point, this Report has specifically examined the effects of AEDPA and IIRIRA on the Cambodian-American community. However, the distinguishing characteristics of their experience – the residual effects of violence, the assimilation difficulties, and their failure to understand their immigration status – are not unique to this community. Such experiences are nearly universal among the tens of thousands refugees admitted to the United States each year.[264] This section will examine the wide-ranging effects of U.S. immigration policies on refugee communities by highlighting the experiences of two recently admitted populations, the Somali and Sudanese people. If the U.S. deportation laws are not reformed, then many refugee communities, not just the Cambodian-Americans will be affected.

## I. Residual Effects of Violence

When they arrived in the United States, Cambodian refugees had an extremely high rate of Post Traumatic Stress Disorder (PTSD) and major depression.[265] The problems were particularly acute amongst women and adolescents.[266] A 2005 survey in Long Beach, California, found that 62% of Cambodians struggled with PTSD and 51% with major depression.[267] The prevalence of PTSD and major depression had a direct impact on people's resettlement experience. They often limited a person's ability

to take care of him or herself and to maintain a job.[268] Furthermore, the transition process itself often served to re-traumatize the refugees.[269] Those placed in poor or inner-city neighborhoods, for example, encountered new states of conflict, surrounded by crime and gang warfare.[270]

Similarly, the Sudanese and Somali communities suffer from the residual effects of violence. According to a study by the University of Minnesota Medical School, 80% of Somali males presented psychoses.[271] The experts explained that these episodes were largely related to their war trauma, malnutrition and head injuries.[272] Alternatively, many of the Somali female patients studied showed depressive tendencies and PTSD.[273] The Sudanese "Lost Boys" are also badly traumatized. These individuals witnessed the destruction of their villages by government-sponsored militias.[274] They escaped the violence by walking to Ethiopia and eventually immigrated to the United States.[275] When the "Lost Boys" arrived in the U.S., an estimated 80 to 90 percent suffered from PTSD.[276] Like segments of the Cambodian-American community, many of the "Lost Boys" transition to America exacerbated their already fragile emotional state. Many of the "Lost Boys" were separated from each other and placed in group and foster homes, often resulting in feelings of isolation and loneliness.[277] According to experts, these tendencies may result in depression, domestic violence, and even death.[278]

---

264 74,602 individuals were admitted to the United States as refugees in 2009. Daniel C. Martin, Department of Homeland Security Office of Immigration Statistics (OIS), *Annual Flow Report: Refugees and Asylees: 2009*, http://www.dhs.gov/xlibrary/assets/statistics/publications/ois_rfa_fr_2009.pdf.
265 CHAN, *supra* note 17, at 231 - 32.
266 *Id.* at 232.
267 Grant N. Marshall et al., *Rates and Correlates of Seeking Mental Health Services Among Cambodian Refugees*, 96 AMERICAN JOURNAL OF PUBLIC HEALTH (2006), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1586149/#__secid475410.
268 *Id.* at 231.
269 *Id.* at 234.
270 *Id.*
271 Kroll J. Yusuf et al., *Psychoses, PTSD, and depression in Somali refugees in Minnesota*, (Mar. 11, 2010), http://www.ncbi.nlm.nih.gov/pubmed/20354676.
272 *Id.*
273 *Id.*
274 *Id.*
275 *Id.*
276 Lindsey Collom, *Stress Issues Still Plauge 'Lost Boys,'* THE ARIZ. REPUBLIC, Apr. 7, 2008, *available at* http://www.azcentral.com/news/articles/2008/04/07/20080407lostboys0407.html.
277 "Lost Boys of Sudan" have emotional problems, *available at* http://www.bmj.com/cgi/content/full/330/7504/1350-a
278 Collom, *supra* note 276.

## II. Economic and Acculturation Difficulties

The Cambodian-American community faced both economic and cultural difficulties. Twenty years later, the Sudanese-American and Somali-American communities face many of the same challenges.

### A. ECONOMIC STRUGGLES

Lacking both English skills and basic vocational training, Cambodian-Americans had difficulties achieving economic independence. Evidence suggests that the Sudanese and Somali communities are experiencing similar hardship. Like the Cambodian-Americans, they lacked transferable skills and had difficulty securing employment.[279] As a result, approximately 33% of Sudanese[280] and 46.3% of Somali families are below the poverty line.[281]

### B. ACCULTURATION

Many Cambodian-Americans found it difficult to adjust to U.S. culture. When they first settled in the U.S., these refugees experienced a clash between traditional Cambodian culture and the American way of life.[282] Moreover, refugee children tended to assimilate m ore quickly than their parents.[283] In many families, the different rates of acculturation bred division and rebellion.[284] As parents clung to traditional notions of age and gender hierarchy,

adolescents strove to be "normal" American teenagers.[285] In certain poorer neighborhoods, like Long Beach, this rebellion contributed to the development of Cambodian gangs.[286] Gang membership offered some young refugees a surrogate family and a sense of belonging.[287] This activity is responsible for a significant percentage of the deportable offenses committed by Cambodian teens.[288]

The Somali and Sudanese communities also find it challenging to acculturate in America. For example, many Somalis faced discrimination and find it difficult to observe their traditional religious practices.[289] Many in these communities also have trouble communicating due to accented English,[290] which may lead to a sense of isolation from the rest of the population.[291] It is possible that this sense of "isolation and powerlessness" may contribute to depression and violent outbursts.[292] In the worst-case scenario, these outbursts may lead to trouble with the law.[293] Given the requirement that refugees adjust status to become LPRs, such challenges could result in deportation.[294]

## III. Failure to Understand Immigration Status

Sudanese and Somali youth arrived to the U.S. at young ages.[295] The Cambodian-American experience shows that these youth may not understand the implications of their

279  Alliance for African Assistance, *Resettlement Programs* (May 11, 2010) *available at* http://www.alliance-for-africa.org/New%20 Website/23%20new%20resettlement__program.htm.
280  U.S. Census Bureau. *Profile of Selected Demographic and Social Characteristic: People born in Sudan*, 2000, *available at* http://www.census. gov/population/cen2000/stp-159/STP-159-sudan.pdf.
281  U.S. Census Bureau. *Profile of Selected Demographic and Social Characteristic: People born in Somalia*, 2000, *available at* http://www. census.gov/population/cen2000/stp-159/STP-159-somalia.pdf.
282  Cahn, *supra note* 40.
283  *Id.*
284  *Id.*
285  *Id.* at 241-42, 19, 20. As one boy explained, "My Mom tells me, you know, Cambodian tradition, this and that. I always tell them that's in Cambodia, this is America. I do what I got to do."
286  *Id.* at 218. Gangs also developed as a response to the violence faced by Cambodian refugees within poorer neighborhoods.
287  Gary Kar-Chuen Chow, Note, *Exiled Once Again: Consequences of the Congressional Expansion of Deportable Offenses in the Southeast Asian Community*, 12 ASIAN L.J. 103, 120 (2005).
288  *Id.*
289  *Tension over Somali Refugees in Maine*, VAIL DAILY, *available at*, http://www.vaildaily.com/article/20070511/ NATIONAL02/70511021(explaining that a Somali refugee committed suicide after neighbors in his town taunted him while he prayed at the local mosque).
290  Martin Masumbuko Muhindi & Kiganzi Nyakato, *Integration of Sudanese "Lost Boys" in Boston, Massachusetts USA*, 2002, 18 (2002) (unpublished paper, Mellon-MIT Program), *available at* http://web.mit.edu/cis/www/migration/pubs/Mahindi.pdf.
291  *Id.*
292  H. Edward Ransford, *Isolation, Powerlessness, and Violence: A Study of Attitudes and Participation in the Watts Riot*, 73 AMERICAN JOURNAL OF SOCIOLOGY 581-591 (1968).
293  Tim Townsend, *Somali Refugee has a Big Dream*, ST. LOUIS POST-DISPATCH, Feb. 24, 2010, http://www.stltoday.com/stltoday/news/stories. nsf/religion/story/C187677C2E4C6F9D862576D4000FE7157OpenDocument.
294  Jim Douglas, *UPS Driver Shot*, WFAA-TV, Jul. 28, 2009, http://www.txcn.com/sharedcontent/dws/news/localnews/tv/stories/wfaa090727_ wz_upsstab.81e7adb4.html (discussing a Sudanese Refugee killing a local UPS driver. The Sudanese refugee appeared to suffer from mental health issues and depression).
295  *See* Townsend, *supra note* 293; *See generally* MARK BIXLER, THE LOST BOYS OF SUDAN (Univ. of Georgia Press 2005).

immigration status, and may not perceive their native country as being sufficiently stable to permit their return.[296]

Many of the Cambodian deportees did not realize that they could be deported. In fact, only three of the forty-eight interviewees understood their LPR status to mean that they were deportable, and could not stay in America "permanently." Although refugee resettlement programs have improved since the 1980s, they still do not provide adequate information regarding immigration status.[297] As a result, it is possible that the Sudanese and Somali populations may also fail to understand the difference between LPR status and U.S. citizenship.

Even if they do recognize the implications of their status, they still may not believe that their country will accept them. Many Cambodians signed voluntary deportation orders assuming that their native land would never stabilize to the point where it would accept deportees.[298] Because the Somali and Sudanese refugees left war-torn countries, they may also believe that they will never able to repatriate. As a result, they may sign voluntary deportation orders, like the Cambodian refugees before them. If the political climate changes, and a repatriation agreement is signed, then these highly traumatized refugees could also find themselves deported.

The U.S. has recognized the need to protect refugees from all over the world, as displayed by an increase in the annual ceiling for refugees admitted to the U.S. through the resettlement program, from 70,000 for the years 2002 until 2007, to 80,000 in 2008 and 2009.[299] However, after admitting such refugee populations, the U.S. must ensure their protection and equal opportunity under the law, even in the event that such individuals are charged with or convicted of a crime. The challenges experienced by the Cambodian-American community will surely be replicated if reforms are not made, resulting in further instances of fractured communities and families.

## Conclusion

Like any community in the U.S., refugees may come into contact with the criminal justice system. Due to unique experiences characterized by hardship, such individuals require special considerations. Instead, refugees are met with overly expansive categories for deportation established by AEDPA and IIRIRA. In the Cambodian-American community, the effects of these laws led to the separation of families, the deportation of non-violent offenders and the mentally ill, and the disruption of an entire community. In order to prevent the repetition of these injustices against other refugee populations, the United States must reform AEDPA and IIRIRA to reflect the pre-1996 categories of deportable offenses and to reintroduce judicial discretion in the removal process. By doing so, the United States will align its deportation policies with international principles of proportionality and *non-refoulement*, as well as limit the devastating effects of the current policies on individuals with mental disabilities. A viable and propitious opportunity to advance such reforms exists in the current political environment, in which comprehensive immigration reform exists as a national focus. In short, U.S. deportation policy must change before it fails another community of refugees.

## Acknowledgments

This report is a collaborative project of the Walter Leitner International Human Rights Clinic of the Leitner Center for International Law and Justice at Fordham Law School (FLS), the Returnee Integration and Support Center (RISC), and Deported Diaspora. It was written primarily by FLS J.D. Candidates Amelia Canter '10, Xiomara Ferrera '11, Erin Miles '11, and Catherine Parnell '10 under the direction of Clinic Director and Professor Chi Mgbako and project co-supervisor Zaid Hydari (Dean's Fellow 2009-2010, FLS '09). Additional editorial assistance was provided by Dimple Rana, co-founder, co-director, and lead organizer of Deported Diaspora, and Sandy Wright, co-founder and co-director of Deported Diaspora. Fieldwork for the report was conducted in Cambodia in March 2010 and would not have been possible without the assistance of the RISC staff, including Executive Director Kloeung Aun and Liaison Officer & Case Manager Keo Sarith. The authors and editors thank all returnees who shared their personal stories of hardship.

296  *See e.g.* Interview with Dith (pseudonym), *supra* note 100.
297  OFFICE OF REFUGEE RESETTLEMENT, REFUGEE ASSISTANCE, http://www.acf.hhs.gov/programs/orr/about/divisions.htm (last checked May 10, 2010).
298  See, e.g., Interview with Rith (pseudonym), *supra* note 141.
299  *Annual Flow Report: Refugees and Asylees: 2009*, *supra* note 264.



**Leitner Center**
**for International Law and Justice**

Walter Leitner International Human Rights Clinic

**Fordham Law School**
33 West 60th Street, Second Floor
New York NY 10023
212.636.6862

www.leitnercenter.org

# Exhibit No. 11

# *Human Rights*

# *Violation*



*Exhibit # 2 Articles*

NEWS / ASIA PACIFIC

# Cambodian PM's son gets military roles amid human rights concerns

*Move seen by rights groups as a bid to undermine democracy and to entrench the PM's power before this month's polls.*

**1 Jul 2018**



Hun Manet, right, was promoted to acting chief of joint staff and commander of the army headquarters [Jeff Christensen/Reuters]

The general, who is also a member of the ruling Cambodian People's Party's central committee and a deputy commander of the Royal Cambodian Armed Forces, brushed off the sanctions Wednesday.

"The United States doesn't split the fish, but it splits the snail. I mean, I have no money. Anyone who has money, the U.S. should put pressure on. But it just puts pressure on me who has no money," he said, chuckling.

"I do not know what the U.S. thinking is. This is its right — and it is the powerful country — if it wants to pressure someone. For me, I don't care. I would like to say thanks, too. And if there is any wealth in the United States, freeze it quickly and take it all."

The general said he had no properties or businesses in the United States and claimed that his involvement in the 2013 and 2015 incidents "followed the rule of law," while denying culpability for the 1997 grenade attack.

Cambodia's Ministry of Defense issued a press release saying it "regrets, denies, and condemns the U.S. Department of Treasury sanctions on Cambodian General Hing Bun Hieng by freezing his assets."

## The allegations

On March 30, 1997, four grenades were lobbed into a crowd of about 200 supporters of former opposition leader Sam Rainsy's Khmer National Party in front of the then–National Assembly opposite Wat Botum Park. At least 16 people were killed, and more than 100 others injured.

Brigade 70, Hun Sen's personal bodyguard unit, was deployed at the rally, and multiple eyewitnesses later told the FBI the soldiers allowed perpetrators to escape into a nearby pagoda before blocking those pursuing them.

Hing Bun Hieng was deputy commander of the unit and told *The Phnom Penh Post* afterward that he wanted to kill journalists who alleged Hun Sen's bodyguards had been involved.

EAST ASIA

# US Sanctions Cambodian General Over Human Rights Abuses

June 14, 2018 1:20 AM

David Boyle Kann Vicheika

PHNOM PENH, CAMBODIA — The United States has imposed sanctions on the commander of Cambodian Prime Minister Hun Sen's personal bodyguard unit over human rights abuses.

The sanctions target General Hing Bun Hieng, a member of the prime minister's close inner circle. The move comes after the U.S. State Department and Senate repeatedly warned that the punitive measures would be forthcoming if Cambodia did not reverse recent anti-democratic actions, such as the dissolution of the opposition and jailing of its leader, Kem Sokha.

Any assets Hing Bun Hieng holds in the U.S. will be frozen while U.S. entities, including banks, will be banned from doing business with him, according to federal government regulations.

"General Bun Hieng commanded a Cambodian unit that engaged in a series of human rights abuses and was personally implicated in attacks against a number of individuals, including a U.S. citizen," said Sigal Mandelker, a Treasury official, in a statement issued Tuesday.

## Wat Phnom temple

The statement cited a deadly 1997 grenade attack that injured a U.S. citizen, an attack at the Wat Phnom Buddhist temple in 2013 and the savage beating of two opposition lawmakers in 2015.

"Tell them that I want to kill them ... publish it. Say that I, chief of the bodyguards, have said this. I want to kill. ... I am so angry," he reportedly said.

U.S. citizen Ron Abney, country director of the International Republican Institute, was injured, prompting the FBI investigation, which was never completed but had strongly suggested forces loyal to Hun Sen were responsible.

## Violent crackdowns

Regarding what happened in 2013 at Wat Phnom, it is not entirely clear which incident the Treasury Department was referring to, as there were several violent crackdowns in the area that year. Officials from the U.S. embassy in Phnom Penh have not replied to a request for clarification.

In October 2015, Nhay Chamroeun and Kong Sakphea, lawmakers from the opposition Cambodia National Rescue Party, or CNRP, were dragged from their cars and beaten directly in front of the National Assembly.

Three PMBU members were convicted of the attack, which was caught on video. They were promoted upon their release from jail.

## Experts divided on sanctions

Opinions are sharply divergent on whether sanctions will have any impact on a regime that has dissolved the country's only viable opposition ahead of an election in late July.

Human Rights Watch has long lobbied for this type of action, and its deputy Asia director, Phil Robertson, said Wednesday the measure was "appropriate and overdue."

"Well, they've got it right. You know, he is the leader of an entity involved in serious human rights abuses and everybody knows it. I guess, I hope, this is the beginning," he said.

Robertson rejected the argument that such sanctions could do more harm than good by pushing the country further into the orbit of China, which has eclipsed U.S. influence in Cambodia in recent years through unrivaled investment and infrastructure loans.

"You know, this whole game of 'because China is involved we can't say anything,' is a recipe for lowest common denominator approaches toward an increasingly dictatorial rights-abusing government that, because it says it doesn't care, people take them at their word."

Lee Jones, an associate professor in international politics at Queen Mary University of London, said in an email that the sanctions move is "a purely symbolic action that will change nothing on the ground."

"The Cambodian government has already taken a very nationalistic posture towards 'external interference' and painted the opposition as tools of foreign powers — this will only provide further ammunition, while not actively helping the opposition one iota," he wrote.

The sanctions sent an "important message to Cambodia's leadership that grave human rights violations will not go unpunished," said Charles Santiago, a Malaysian lawmaker and chairperson of ASEAN Parliamentarians for Human Rights, in a statement.

"Particularly with elections on the horizon, we look forward to further concrete measures by the United States and other international actors to push back against government efforts to cripple democracy and human rights protections in Cambodia," he wrote.

---

# Exhibit No. 12

# *Order of Supervision*

ce of Detention and Removal Operations
institutional Hearing Program

**U.S. Department of Homeland Security**
7405C1 Highway 75 South
Huntsville, Texas 77340



**U.S. Immigration
and Customs
Enforcement**

May 15, 2018

Chanthol CHEM
A025 374 511
TDCJ# 1747802
C/O TDCJ
PO Box 99
Huntsville, TX  77342

Dear Sir:

This is to inform you that the order of supervision has been revoked for failure to abide by one or more conditions.

*On December 3, 2007, you were released on an Order of Supervision with conditions to include that you do not commit any crimes while on the Order of Supervision.  On September 8, 2011, you were convicted in the 363rd Judicial District Court of Dallas County, Texas for the offense of Theft 20K. For the above listed offense, you were sentenced to 10 years confinement. You failed to follow the conditions on the Order of Supervision as agreed.*

Based on the above, I hereby revoke the order of supervision.

Sincerely,

*Kelly K. D;—*

Supervisory Detention and Deportation Officer
Huntsville, Texas

**PROOF OF SERVICE**